**CHUBB LLOYDS INSURANCE COMPANY OF TEXAS and Dr. Erwin Cruz, Appellants/Cross–Appellees,**

v.

**ANDREW'S RESTORATION, INC. d/b/a Protech Services, Appellee/Cross–Appellant,**

and

**Rudy Martinez, Appellee.**

No. 05–08–01099–CV.

Court of Appeals of Texas, Dallas.

Aug. 20, 2010.

Rehearing Overruled Oct. 26, 2010.

Russell W. Schell, Schell Cooley LLP, Cyrus S.J. Manekshaw, Jennifer Gossom Martin, Douglas W. Brady, Brady & Cole, P.C., Dallas, TX, Adam J. Williams, Jerry R. Hall, Schell Cooley LLP, Addison, TX, for Appellants.

Shawn M. McCaskill, Goodwin Ronquillo, L.L.P., Alvin H. Badger, Dallas, TX, for Appellee.

Before Justices MOSELEY, FITZGERALD, and FILLMORE.

## OPINION

Opinion By Justice FITZGERALD.

Andrew's Restoration, Inc. d/b/a Protech Services performed mold-remediation services on the home of Dr. Erwin Cruz and went unpaid. Protech sued Cruz and his homeowner's insurance carrier, Chubb Lloyds Insurance Company of Texas. Cruz and Chubb impleaded Protech's owner, Rudy Martinez, as a third-party defendant. Some of the claims were resolved by a separate bench trial. Others were resolved on summary judgment, and the rest were tried to a jury. The trial court rendered judgment on the jury verdict, awarding Protech roughly $700,000 jointly and severally against Cruz and Chubb. The court also awarded Protech its appellate attorneys' fees but no attorneys' fees for preparation and trial. Chubb, Cruz, and Protech appealed. We affirm in part, reverse and render in part, and modify the judgment interest rate from 6% to 5%.

## I. BACKGROUND

### A. Facts

The evidence at trial showed the following. Cruz first noticed a water-leakage problem with his house in Dallas in early 2001. He contacted his friend Martinez, because he knew Martinez "did that kind of work." Cruz signed a document on Protech letterhead called "Work Authorization and Assignment of Insurance Benefits" on or about March 2, 2001. In that document, Cruz authorized Protech to "perform the work essential to complete restoration," and he stated that he under-

stood he was "financially responsible for the payment" of his deductible and "all and any charges" that were not paid by his insurance company. Martinez arranged for a company called Afram International to perform some tests in the house, and he told Cruz that the house had tested positive for mold. Cruz and his family moved out of the house in or about May 2001.

At some point, Cruz notified Chubb of the damage to his house, and he hired an attorney named Adam Hardison to deal with Chubb on his behalf. William Marx was the Chubb adjuster who began working on Cruz's claim in May 2001. Martinez testified that Marx "verbally authorized" Protech to remove and "bio-clean" the contents of Cruz's house, and that Cruz paid for that service. In August 2001, Chubb acknowledged that Cruz's claim was covered. Marx testified that around that same time Martinez expressed the view that remediation of the house could exceed Cruz's policy limits.

In October 2001, Hardison sent Marx a letter advising that Cruz preferred to demolish the house rather than attempt to repair it. In that letter, Hardison quoted estimates from Protech as to how much it would cost to implement each of those options, which were about $124,000 to demolish the house and $437,000 to remove all contaminated and damaged parts. In January 2002, Hardison sent Marx another letter advising that Cruz wanted to call the house a total loss and demanding almost $4 million so that Cruz could tear down and rebuild the house. Marx responded with a letter in which he neither accepted nor rejected the demand, and in which he proposed to hire a contractor to estimate the cost of remediating and reconstructing the house instead of demolishing it.

Marx testified that Chubb hired a construction expert named David Gregg who examined the house around April 2002.

Gregg reported that nothing had been done to prevent the mold from spreading within the house, and Marx advised Hardison that Cruz should do something to prevent the mold from spreading so as to mitigate his damages. On or about June 5, 2002, Cruz signed a one-page document on Protech letterhead setting forth a daily rate of $6,298.44 to supply dehumidification equipment and monitoring at his house. The document stated as follows:

I, Dr. Erwin Cruz, authorize Pro–Tech Services to begin controlling the humidity level at my residence ... per the fiduciary responsibilities of my insurance policy and per the recommendation of Afram International, Gregg Construction, and Pro–Tech Services.

I understand that this daily rate will be submitted to my insurance for payment. I also acknowledge that this daily rate will be in effect until a remediation decision is made or until written notice to remove the equipment is submitted to Pro–Tech Services.

Protech supplied humidity-control service at the house for about a year, from June 2002 to June 2003. Marx testified that conditions in the house were substantially stabilized by December 2002 and that the mold levels were significantly reduced after Protech began its work. During the same time frame, Protech prepared multiple estimates for the cost of remediating and restoring the house. Protech's June 2002 estimate was that remediation of the house would cost about $1 million and restoration of the house after remediation, including installation of a new roof, would cost about $1.7 million.

Martinez testified that Chubb paid Protech directly for the humidity-control services, at least for a time. Marx testified that Chubb put Protech's name on the checks at Hardison's direction. Protech stopped getting paid for its services at

some point, and its attorney sent letters to Marx requesting payment in March and April 2003. In June 2003, Hardison instructed Martinez to stop providing the humidity-control services. Marx testified that Chubb decided that same month to pay a reasonable and fair cost to remediate and repair the home.

Cruz testified that Chubb paid the policy limits in about November 2003, and he demolished the house in 2005.

## B. Procedural history

In January 2004, Protech sued Cruz and Chubb on numerous legal theories. It alleged that both defendants were liable to it on theories of breach of an oral contract, quantum meruit, breach of an implied-in-fact contract, and fraud in the inducement. Protech also alleged breach of a written contract against Cruz and sought to foreclose on mechanics' and materialmen's liens on Cruz's house. Chubb counterclaimed for common-law fraud and insurance fraud. Cruz counterclaimed to void Protech's liens, for rescission of any contract with Protech, and for violations of the Texas Deceptive Trade Practices–Consumer Protection Act.

The trial court ordered separate trials. The first trial would determine whether the house in question was Cruz's homestead and whether Protech's liens were valid. Before that trial was held, the court rendered a partial summary judgment in which it ruled that Protech failed to comply with certain provisions of Texas law regarding liens. The court held a bench trial on the issue of whether Cruz had abandoned his homestead. The court signed an order in which it ruled that Protech failed to prove abandonment of the homestead, voided the liens, and severed those issues out of the case.

Cruz and Chubb amended their pleadings to assert third-party claims against Martinez. Cruz obtained a partial summary judgment in which the trial court ruled that he was a consumer under the DTPA and that Protech and Martinez violated the DTPA by failing to include certain language required by the Texas Property Code in their contracts with Cruz. Chubb obtained a partial summary judgment that Protech take nothing from Chubb on its claims for quantum meruit and fraud. Then Cruz obtained a partial summary judgment that Protech take nothing from Cruz on its fraud claim.

The rest of the claims—principally Protech's breach-of-contract claims against Cruz and Chubb, and Cruz's and Chubb's fraud and DTPA counterclaims and third-party claims against Protech and Martinez—were tried to a jury. During the trial, the trial court signed a partial summary judgment order ruling that it would take roughly $1 million to restore to Cruz all the money paid to Protech and Martinez by Cruz or on his behalf pursuant to contracts that the court had previously ruled violated the DTPA. The jury found that Chubb breached an agreement with Protech and caused Protech $705,548.02 in damages. The jury also found that there was an agreement between Cruz and Protech, that Cruz breached the agreement, and that the breach caused Protech $705,548.02 in damages. The jury did not find that Protech or Martinez committed fraud, negligent misrepresentation, or DTPA violations against Chubb or Cruz. The jury further found that Cruz suffered no damages from Protech's and Martinez's failure to include certain contract terms required by the Texas Property Code.

The trial court signed a final judgment that Protech recover the sum of $705,548.02 from Cruz and Chubb jointly and severally, plus contingent appellate attorneys' fees. The court later signed an amended judgment that modified the origi-

nal judgment only slightly. Chubb and Cruz filed motions for new trial, which the trial court denied. The court also denied Protech's motion to amend the final judgment.

Chubb, Protech, and Cruz each filed a notice of appeal from the judgment.

## II. Chubb's Appeal

Chubb raises three issues on appeal, the first two of which are intertwined. In its first issue, it contends the agreement that the jury found Chubb breached is unenforceable because it is within the "surety-ship provision" of the statute of frauds but is not in writing. In its second issue, Chubb contends the evidence is legally and factually insufficient to support the jury's findings establishing the main-purpose exception to the statute of frauds. In its third issue, Chubb argues the trial court erred by making Chubb and Cruz jointly and severally liable for debts predicated on two different contracts.

## A. Standard of review

With respect to Chubb's legal-sufficiency challenge, Chubb must show that there is no evidence to support the jury's adverse finding. In making this determination, we view the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable person could and disregarding contrary evidence unless a reasonable person could not. Anything more than a scintilla of evidence is legally sufficient to support a challenged finding. *See generally Sutton v. Ebby Halliday Real Estate, Inc.*, 279 S.W.3d 418, 421–22 (Tex.App.-Dallas 2009, no pet.). Evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists. *Adams v. State Farm Mut. Auto. Ins. Co.*, 264 S.W.3d 424, 427 (Tex.App.-Dallas 2008, pet. denied). But if the evidence would

enable reasonable and fair-minded people to differ in their conclusions, we may not substitute our judgment for that of the jury. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex.2005).

As to Chubb's factual-sufficiency challenge, we consider all the evidence and set aside the verdict only if the evidence supporting the jury finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *State Farm Lloyds v. Hamilton*, 265 S.W.3d 725, 729 (Tex.App.-Dallas 2008, pet. dism'd).

## B. Statute of frauds

We address Chubb's first two issues together, considering whether there is sufficient evidence to support the jury's answers to Question 1 regarding the main-purpose exception to the statute of frauds.

### 1. Law of the statute of frauds

■ A promise or agreement within the statute of frauds is not enforceable unless the promise or agreement, or a memorandum of it, is in writing and signed by the person to be charged or by someone lawfully authorized to sign for him. Tex. Bus. & Com.Code Ann. § 26.01(a) (Vernon 2009). The statute of frauds applies to "a promise by one person to answer for the debt, default, or miscarriage of another person." *Id.* § 26.01(b)(2). In other words, a promise by one person to pay another's debt is generally not enforceable unless it is in writing. *See id.; Chrissikos v. Chrissikos*, No. 05–00–01548–CV, 2002 WL 342653, at *6 (Tex.App.-Dallas Mar. 6, 2002, pet. denied) (not designated for publication). "Probably the basic reason for requiring that a promise to answer for the default of another be in writing is that the promisor has received no direct benefit from the transaction." *Cooper Petroleum Co. v. La-Gloria Oil & Gas Co.*, 436 S.W.2d 889, 895

(Tex.1969). Chubb contends, and Protech does not dispute, that any promises Chubb made to Protech were oral promises to cover Cruz's debts to Protech arising from Protech's work on Cruz's house.

■ Even if a promise comes within the suretyship provision of the statute of frauds, it may still be enforceable under the main-purpose doctrine. *Haas Drilling Co. v. First Nat'l Bank in Dall.,* 456 S.W.2d 886, 890 (Tex.1970). Under this doctrine, if "the promise is made for the promisor's own benefit and not at all for the benefit of the third person," the reason for the statute of frauds fails, and the promise should be enforced. *Cooper Petroleum Co.,* 436 S.W.2d at 895. Courts have identified three tests to determine if the main-purpose doctrine makes a particular oral promise enforceable despite the statute of frauds:

1. Did the promissor intend to become primarily liable for the debt, in effect making it his original obligation, rather than to merely become a surety for the original obligor?

2. Was there consideration for the promise?

3. Was receipt of the consideration the promissor's main purpose or leading object in making the promise, i.e., was the consideration given for the promise primarily for the promissor's own use and benefit[?]

*Smith, Seckman, Reid, Inc. v. Metro Nat'l Corp.,* 836 S.W.2d 817, 821 (Tex.App.-Houston [1st Dist.] 1992, no writ); *accord Haas Drilling Co.,* 456 S.W.2d at 890; *Gulf Liquid Fertilizer Co. v. Titus,* 163 Tex. 260, 267–68, 354 S.W.2d 378, 383 (Tex. 1962). As explained below, the jury found that all three tests were satisfied.

**2. The jury's findings**

■ Protech's only liability theory against Chubb that was submitted to the jury was breach of contract. In the absence of a relevant objection to the jury charge, we evaluate the sufficiency of the evidence based on the charge and instructions that were submitted to the jury. *Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex. 2000); *EMC Mortg. Corp. v. Jones,* 252 S.W.3d 857, 869 (Tex.App.-Dallas 2008, no pet.). There were no objections to the charge pertinent to Chubb's argument, so we quote Question 1 of the jury charge in full, along with the jury's answers (in italics):

Did an agreement exist between Pro-Tech and Chubb Lloyds with respect to the services to be performed by ProTech at Dr. Cruz's residence?

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties['] unexpressed thoughts or intentions.

To form a valid contract, the parties must have the same understanding of the contract and all its essential terms. To be enforceable, a contract must be reasonably definite and certain. In attempting to reach an agreement, one party may specifically prescribe the time, manner or other requirements for the other party's acceptance of the offer. If the offer is not accepted as prescribed, there is no agreement.

You are further instructed that in order to find that an agreement existed between ProTech and Chubb Lloyds with respect to the services to be performed by ProTech at Dr. Cruz's residence, you must answer "Yes" to each and every of the following three questions:

a. Did Chubb Lloyds intend to accept primary liability for Dr. Cruz's debt, if any, to ProTech?

Answer "Yes" or "No": *yes*

b. Did Chubb Lloyds receive direct consideration for its promise to be primarily liable for Dr. Cruz's debt? Answer "Yes" or "No": *yes*

c. Was the direct consideration Chubb Lloyds received, if any, Chubb Lloyds' main purpose for agreeing to accept primary liability for Dr. Cruz's debt? Answer "Yes" or "No": *yes*

If you answered "Yes" to each and every of the preceding three questions (a)-(c), then proceed to answer Question Number Two. Otherwise, go to Question Number Six.

In Question 2, the jury found that Chubb breached the agreement referenced in Question 1, and, in Question 4, the jury found that Protech's damages resulting from Chubb's breach were $705,548.02. The trial court denied Chubb's motion for judgment notwithstanding the verdict attacking all three jury findings in answer to Question 1 for lack of evidence.

### 3. Sufficiency of the evidence

Chubb attacks the sufficiency of the evidence as to all three subparts to Question 1. Because all three "yes" answers to Question 1 were essential to the jury's only liability and damages findings against Chubb, insufficient evidence to support any of the three subparts will require reversal. *See Osterberg,* 12 S.W.3d at 55. We proceed directly to subpart (b) and conclude that there was no evidence to support the jury's "yes" answer to that subpart.

### a. Direct consideration

■ Chubb contends there is no evidence that it received direct consideration for its promise, if any, to be primarily liable for Cruz's debt. We agree.

Protech contends there was some evidence that in late June 2003—after Pro-tech had been instructed not to provide any more services at Cruz's house—Marx promised that Protech "would get paid for the outstanding invoices" to Cruz. But Protech cites no evidence showing it promised or furnished any additional consideration to Chubb in exchange for this alleged promise. We have found no evidence of any such consideration in the record. Protech's rendition of services at Cruz's house before Chubb's alleged June 2003 promise is no evidence of "direct consideration" to Chubb because "past consideration is not competent consideration for contract formation." *Powerhouse Prods., Inc. v. Scott,* 260 S.W.3d 693, 697 (Tex.App.-Dallas 2008, no pet.).

Otherwise, Protech relies wholly on alleged statements by Marx at the June 2002 meeting as establishing Chubb's promise to be directly liable to Protech, but there is no evidence of direct consideration to Chubb for that alleged promise either. The principal and direct benefit to be gained by controlling the humidity in Cruz's house was to improve the physical condition of that house by making it a less hospitable environment for mold. Cruz was the primary beneficiary of this service, both because it was his property that was being improved and because the service tended to satisfy his contractual obligation under the insurance policy to "protect the property from further damage." Protech contends Chubb benefited from the humidity-control services because those services afforded Chubb "a year to attempt to remediate and restore the Cruz residence and avoid having to declare the Cruz residence a total loss." We do not agree that this constituted direct consideration to Chubb. At most it was a remote and indirect benefit. This case is similar to *Cooper Petroleum,* in which a creditor sued an individual who had allegedly made an oral promise to guarantee a corpora-

tion's debt, with the result that the creditor continued to do business with the corporation on credit. 436 S.W.2d at 896. The individual was not a stockholder of that corporation, and the only benefit he received from the creditor's extension of credit was through his being a stockholder of a different corporation that owned a potential stake in the debtor corporation. *Id.* That benefit, the supreme court held, was "too remote and indirect" to make the oral promise enforceable as the individual's original undertaking. *Id.*

Our unpublished decision in *Chrissikos* is also persuasive. After reviewing the authorities, we held that the consideration necessary to take a promise of suretyship out of the statute of frauds must be "a direct benefit to the promissor" rather than a "potential benefit." *Chrissikos*, 2002 WL 342653, at *6. We then concluded that an individual's oral promise to guaranty a corporate debt was not supported by direct consideration to her, even though she was one of the founders of the corporation and might have earned a salary if it had become profitable. *Id.* at *7. In the same way, any benefit to Chubb from Protech's services in the form of savings on its ultimate pay-out on Cruz's claim was purely speculative and does not constitute a direct benefit to Chubb.

### b. Conclusion

There is no evidence that any agreement by Chubb to pay Protech's bill was supported by direct consideration, as the jury found in answer to Question 1(b). That finding was essential to Protech's recovery against Chubb, so the trial court erred by failing to grant Chubb's motion for judgment notwithstanding the verdict.

### C. Disposition of Chubb's appeal

There is no evidence to support the jury's finding in answer to Question 1(b).

Accordingly, we reverse the judgment against Chubb for damages and attorney's fees. We render judgment that Protech take nothing from Chubb. In light of this disposition, we need not address Chubb's third issue on appeal in which it complains of the imposition of joint and several liability on it and Cruz.

### III. Cruz's Appeal

Cruz raises eight issues on appeal: (1) the judgment interest rate is incorrect; (2) the trial court erred by failing to award Cruz the DTPA remedy of restoration of consideration; (3) the trial court erred by failing to award Cruz his attorneys' fees for removal of the liens against his homestead; (4) the trial court erred by failing to award Cruz his attorneys' fees for prevailing on his DTPA claim; (5) the agreement between Cruz and Protech is unenforceable as a matter of law; (6) there was insufficient evidence to support the jury's finding of an agreement between Cruz and Protech; (7) under the jury's findings and a prior determination of fact by the trial court, Protech had no damages and its net recovery from Cruz should have been zero; and (8) the trial court erred by making Cruz and Chubb jointly and severally liable. We address the issues in what we deem to be the logical order.

### A. Sufficiency of the evidence of an enforceable agreement

■ In his sixth issue, Cruz contends the evidence is legally and factually insufficient to support the jury's finding that Cruz and Protech had an agreement. The jury answered "yes" to the following question, reprinted here with its accompanying instructions:

Did Protech Services and Dr. Cruz agree that Protech Services would provide services concerning Dr. Cruz's residence and that Dr. Cruz would person-

ally be responsible for paying for the services at the rates that were charged by Protech Services?

In order to have an agreement, the parties must have the same understanding of the subject matter of the contract and all its essential terms, and the agreement must be reasonably definite and certain.

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties unexpressed thoughts or intentions.

In order to have an agreement, there must be a valid offer. To have a valid offer, (1) Protech Services must intend to make an offer, (2) the terms of the offer must be clear and definite, and (3) Protech Services must communicate the essential terms of the offer to Dr. Cruz.

 The elements of a valid and enforceable contract are (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Searcy v. DDA, Inc.*, 201 S.W.3d 319, 322 (Tex.App.-Dallas 2006, no pet.). To prove that an offer was made, a party must show (1) the alleged offeror intended to make an offer, (2) the terms of the offer were clear and definite, and (3) the offeror communicated the essential elements of the offer to the offeree. *Domingo v. Mitchell*, 257 S.W.3d 34, 39 (Tex. App.-Amarillo 2008, pet. denied). The determination of whether there was a meeting of the minds is based on an objective standard of what the parties said and did rather than on their subjective state of mind. *Searcy*, 201 S.W.3d at 322.

Cruz contends the documents he signed, taken individually, are too indefinite to constitute a valid offer, and that they cannot be combined to constitute a single offer. Protech responds that the documents together do constitute a valid offer to perform humidity-control services for Cruz in exchange for his promise to pay, and that Cruz accepted the offer when he signed the documents.

We review the evidence pertaining to the existence of a clear and definite offer. The March 2001 work authorization provided as follows:

> I hereby assign to, and authorize my insurance company to pay directly to **PROTECH SERVICES** such portion of the proceeds of my insurance policy as shall be required to pay **PROTECH SERVICES** in full for restoration services rendered pursuant to this work authorization for the property[.]
>
> I certify and further authorize **PROTECH SERVICES** to perform the work it deems essential to complete restoration, and understand that I am financially responsible for the payment of my deductible amount and for all and any charges that are not paid by my insurance company, and agree to pay or direct payment to **PROTECH SERVICES** upon receipt of their invoice.

The July 2002 proposal sets forth the equipment and labor charges that Protech proposed for its humidity-control services, which charges totaled almost $6,300 per day. The text of the document was as follows:

> I, Dr. Erwin Cruz, authorize Pro–Tech Services to begin controlling the humidity level at my residence located at 5920 Gladeside Dr., Dallas, TX 75287 per the fiduciary responsibilities of my insurance policy and per the recommendations of Afram International, Gregg Construction, and Pro–Tech Services.

I understand that this daily rate will be submitted to my insurance for payment. I also acknowledge that this daily rate will be in effect until a remediation decision is made or until written notice to remove the equipment is submitted to Pro–Tech Services.

Cruz signed both documents.

If the documents can properly be read together, as Protech contends, then Cruz's argument fails. The 2002 proposal set forth the specific services that Protech proposed to provide at the house and the specific charges for that work, but it contains no express promise by Cruz to pay. The 2002 proposal recites only that Cruz understood that the "daily rate" would be submitted to Chubb for payment. But if the 2001 work authorization was also part of the transaction, it supplies Cruz's express promise to pay for Protech's services. Thus, the question becomes whether the documents should be read together. We conclude that they can and must be read together.

 "Under generally accepted principles of contract interpretation, all writings that pertain to the same transaction will be considered together, even if they were executed at different times and do not expressly refer to one another." *DeWitt Cnty. Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 102 (Tex.1999) (footnote omitted). Only when the terms of one writing are so inconsistent with those of the other that the two cannot subsist together is there a presumption that the second writing superseded the first. *IP Petroleum Co. v. Wevanco Energy, L.L.C.,* 116 S.W.3d 888, 899 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). In this case, both documents pertain to the same transaction: the provision of services by Protech relating to the water and mold damage to Cruz's house. They are not inconsistent. The 2001 work authoriza-

tion makes it clear that Cruz is financially responsible for payment of any amounts not paid by insurance. The 2002 proposal does not contradict the terms of the 2001 work authorization. Although it recites Cruz's understanding that Protech's bills would be submitted to Chubb for payment, it does not state that Protech would look only to Chubb for payment or otherwise indicate that Cruz would have no financial responsibility for the work done under the proposal. Thus, the two documents are consistent and must be considered together. The 2001 document supplies Cruz's promise to pay for Protech's services, and the 2002 document supplies the specific terms regarding the services and the price. Together, they are clear and definite enough to constitute an enforceable contract.

We reject Cruz's argument under his sixth issue.

**B. Enforceability of the agreement as a matter of law**

In Cruz's fifth issue, he argues that his agreement with Protech was unenforceable as a matter of law for three reasons: it violates a Texas statute, it is unconscionable, and it is contrary to Texas public policy. Protech does not dispute that the contract failed to comply with section 41.007(a) of the Texas Property Code, but it contends that this noncompliance did not render the agreement unenforceable. Protech also points out that the jury rejected Cruz's DTPA counterclaim based on unconscionability.

**1. Illegality and public policy**

 At the relevant time, section 41.007(a) of the property code provided that a contract for work and material used in constructing improvements on a homestead

must contain the following warning conspicuously printed, stamped, or typed in a size equal to at least 10–point bold type or computer equivalent, next to the owner's signature line on the contract:

"IMPORTANT NOTICE: You and your contractor are responsible for meeting the terms and conditions of this contract. If you sign this contract and you fail to meet the terms and conditions of this contract, you may lose your legal ownership rights in your home. KNOW YOUR RIGHTS AND DUTIES UNDER THE LAW."

Act of April 15, 1993, 73d Leg., R.S., ch. 48, § 4, 1993 Tex. Gen. Laws 97, 98 (amended 2007) (current version at TEX. PROP.CODE ANN. § 41.007(a) (Vernon Supp. 2009)). Section 41.007(b) provided (and still provides) that a violation of section 41.007(a) is a false, misleading, or deceptive act or practice within the meaning of the DTPA and is actionable under the DTPA. TEX. PROP.CODE ANN. § 41.007(b) (Vernon Supp. 2009). It is undisputed that the statutory warning was not included in Cruz and Protech's agreement, and the trial court signed a partial summary judgment ruling as a matter of law that Protech and Martinez violated the DTPA by not including the required warning in the contract. Cruz contends in essence that the trial court erred by overruling his motion for judgment notwithstanding the verdict in which he argued that the agreement was unenforceable as a matter of law.

▆▆▆▆ Cruz relies on "the general rule that an agreement which violates a valid statute is illegal and void, and cannot be enforced." *Woolsey v. Panhandle Ref. Co.*, 131 Tex. 449, 455, 116 S.W.2d 675, 678 (Tex.1938). As the court observed later in the opinion, "this court has repeatedly refused to enforce contracts which are either expressly or impliedly prohibited by stat-

utes or by public policy." *Id.* at 456, 116 S.W.2d at 678. "An illegal contract is one in which the parties undertake to do an act forbidden by the law of the place where it is to be done, and as such it is an invalid agreement which imposes no legal obligation." *SCI Tex. Funeral Servs., Inc. v. Hijar,* 214 S.W.3d 148, 156 (Tex.App.-El Paso 2007, pet. denied); *accord Signal Peak Enters. of Tex., Inc. v. Bettina Invs., Inc.,* 138 S.W.3d 915, 920 (Tex.App.-Dallas 2004, no pet.) ("If parties contract to undertake illegal activity, their contract is void and will not be enforced by a court."). But Cruz has not shown that his agreement with Protech required a party to perform an illegal act. Rather, the agreement only failed to comply with a statutory requirement regulating the contents of that kind of contract. This kind of statutory violation comes within a different rule:

> Where a regulatory statute imposes a penalty for its violation but does not expressly declare that contracts in violation of its provisions are void, a contract that contravenes the provisions of the statute is not necessarily invalid.... And a contract in contravention of a regulatory statute is not void and unenforceable if the expressly stated consequences of violating the statute are apparently ample to insure its observance.

*New Boston Gen. Hosp., Inc. v. Tex. Workforce Comm'n,* 47 S.W.3d 34, 40 (Tex. App.-Texarkana 2001, no pet.) (citation omitted); *see also Davis v. Hendrick Autoguard, Inc.,* 294 S.W.3d 835, 840 (Tex. App.-Dallas 2009, no pet.) (using a similar analysis). Unlike some other statutes, section 41.007 of the property code does not provide that omission of the required warning makes a contract invalid or void. *Cf.* TEX. WATER CODE ANN. § 60.408(i) (Vernon Supp. 2009) ("A purchase or contract valued at more than the amount authorized under Section 60.403(a) for routine pur-

chases or contracts that is not in compliance with this subchapter is void and unenforceable."). And section 41.007 provides its own penalty for noncompliance: a failure to include the required warning in the contract is an actionable practice under the DTPA. TEX. PROP.CODE ANN. § 41.007(b). Given the numerous remedies available under the DTPA, we conclude that the statutory consequence for noncompliance is "apparently ample" to insure observance. We hold that the agreement's noncompliance with section 41.007(a) did not make the agreement void or unenforceable.

As to public policy, Cruz simply asserts that the agreement is against public policy because it violates the property code. He provides no argumentation in support of that assertion. We conclude that his public-policy argument presents nothing for us to review. *See In re M.A.S.*, 233 S.W.3d 915, 924 (Tex.App.-Dallas 2007, pet. denied) ("Failure to provide substantive analysis waives an issue on appeal.").

### 2. Unconscionability

■■■■■ Cruz argues that the trial court should have ruled that his agreement with Protech was unenforceable as a matter of law because it was substantively and procedurally unconscionable. An unconscionable contract is unenforceable. *In re Poly–Am., L.P.*, 262 S.W.3d 337, 348 (Tex. 2008). Whether a contract is unconscionable at the time it is formed is a question of law. *Id.* at 349; *Arthur's Garage, Inc. v. Racal–Chubb Sec. Sys., Inc.*, 997 S.W.2d 803, 815 (Tex.App.-Dallas 1999, no pet.).

■■■■■ Substantive unconscionability refers to the fairness or unfairness of the contract or contractual provision itself. *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 677 (Tex.2006). "[I]n general, a contract will be found unconscionable if it is grossly one-sided." *In re Poly–Am.*, 262 S.W.3d at 348; *accord Arthur's Garage,*

997 S.W.2d at 815. In determining whether a contract is unconscionable, we consider factors such as (1) the "entire atmosphere" in which the agreement was made, (2) the alternatives, if any, available to the parties when the contract was made, (3) whether one party lacked bargaining power, (4) whether the contract was illegal or against public policy, and (5) whether the contract is oppressive or unreasonable. *Ski River Dev., Inc. v. McCalla,* 167 S.W.3d 121, 136 (Tex.App.-Waco 2005, pet. denied). Procedural unconscionability refers to the fairness or unfairness of the circumstances surrounding the execution of the contract. *See In re Palm Harbor Homes,* 195 S.W.3d at 677. Factors that may contribute to an unfair bargaining process include (1) knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract and (2) knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement. *Ski River Dev.,* 167 S.W.3d at 136. In applying these principles, we keep in mind Texas's strong policy in favor of freedom of contract. *Besteman v. Pitcock,* 272 S.W.3d 777, 789 (Tex.App.-Texarkana 2008, no pet.). Thus, a contract or contract term is not unconscionable merely because it is foolish for one party and very advantageous to the other, but only when the inequity is so extreme as to shock the conscience. *Id.*

■■■■■ We conclude that the agreement between Cruz and Protech was not unconscionable. As to substantive unconscionability, Cruz relies on the evidence that Martinez himself thought the house should have been torn down rather than remediated, which tends to show that the dehumidification services should not have

been rendered at all. On the other hand, evidence shows that in June 2002, Cruz decided to rely on the opinion of others (unnamed, but presumably Chubb's representatives) that the house could be fixed. Thus, it is not clear that Cruz stood to gain no benefit from Protech's services. Cruz argues the agreement was unfair because its terms were not clear or definite, but we have already concluded that the documents, construed together, are sufficiently clear and definite that Cruz was promising to pay for Protech's services to the extent his insurance did not. Moreover, the 2002 proposal gave Cruz the right to stop the dehumidification work by submitting written notice to Protech, which shows that the agreement was not entirely one-sided. Cruz cites no evidence that the amount Protech charged for its dehumidification services was shockingly excessive. Finally, the fact that the house was later demolished—over a year after Protech stopped rendering its services—does not establish unconscionability because we gauge unconscionability at the time the agreement was made. *See In re Poly–Am.*, 262 S.W.3d at 349 ("Whether a contract is contrary to public policy or unconscionable *at the time it is formed* is a question of law.") (emphasis added). The agreement was not substantively unconscionable.

■ We also conclude that the agreement was not procedurally unconscionable. Cruz argues the evidence showed he was very busy with his medical practice during the relevant time period, that he lacked expertise in the area of home repair, and that he was relying on Martinez's expertise and Martinez knew it. On the other hand, Cruz admitted he did not read the agreements he signed. Cruz also had hired an attorney to work on his insurance claim who could have reviewed the agreements for him. Although Cruz testified that Martinez told him orally that he would have no responsibility whatsoever, Martinez testified that he did not remember ever telling Cruz that. There was no evidence that Cruz was prevented from protecting his own interests because of infirmity, ignorance, or illiteracy. Rather, the evidence showed that Cruz did not read the agreements he signed, accepted the advice of others to try to remediate the house, and hired Martinez "to take care of the house, whatever that means." There was nothing grossly unfair about the bargaining process in this case.

### 3. Conclusion

We reject Cruz's contention in his fifth issue that his agreement with Protech was unenforceable as a matter of law.

## C. Protech's damages

■ Under his seventh issue, Cruz contends Protech had no damages as a matter of law based on (1) a ruling and jury instruction by the trial court that Protech was paid $1,059,940.52 for its services at Cruz's house and (2) the jury's finding that Protech's damages were $705,548.02. Cruz raised this argument below in his amended motion for new trial, which the trial court denied.

The pertinent facts are these. During trial, the trial judge orally instructed the jury that the following facts were undisputed: "monies were paid either by Dr. Cruz or on his behalf to Pro–Tech for services that Pro–Tech claims it was owed for services concerning Dr. Cruz' residence[,] and that sum was $1,059,940.52." Protech adduced evidence at trial that the total amount it was still owed under the agreement was $705,548.02. The jury found in answer to Question 11 of the jury charge that Cruz failed to comply with his agreement with Protech. The related damages question was Question 13, which stated as follows:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Protech Services for its damages, if any, that resulted from such failure to comply?

Answer in dollars and cents for damages, if any, for each of the following:

Do not add any amount for interest on damages, if any. Answer in dollars and cents for damages, if any.

A. The value, if any, of the work performed by Protech

Answer: $ . . . . . . . . .

The jury's answer to Question 13 was $705,548,02, and the trial court rendered judgment against Cruz for that amount.

Cruz interprets Question 13 to have asked the jury to find the total value of all of the work Protech performed on Cruz's house. The jury's finding was less than the amount the trial court instructed the jury had already been paid. Thus, Cruz reasons that the jury's finding, in conjunction with the trial court's instruction, means that Protech was more than fully paid for its services, and its breach-of-contract damages were zero.

■■■ We reject Cruz's argument. If possible, we must interpret the jury's findings in a manner to support the judgment. *Jackson v. U.S. Fid. & Guar. Co.*, 689 S.W.2d 408, 412 (Tex.1985); *Otis Spunkmeyer, Inc. v. Blakely*, 30 S.W.3d 678, 685 (Tex.App.-Dallas 2000, no pet.). Question 13 can reasonably be read in a manner that supports the judgment in this case, because its plain thrust was to seek the amount of money Protech claimed it had earned but had not been paid. The question asked the jury how much money it would take to compensate Protech for its "damages, if any, that resulted from [Cruz's] failure to comply" with their agreement. Afterwards, the jury was twice instructed to answer in dollars and

cents "for damages, if any." The ordinary meaning of "damages," in context, is "a sum of money claimed or awarded *in compensation for a loss or an injury.*" THE NEW OXFORD AMERICAN DICTIONARY 429 (2001) (emphasis added). A reasonable juror would therefore understand the question to be seeking the amount of money necessary to make Protech whole for the work it performed and was not paid for. Because the thrust of the question is to seek that amount, the concluding instruction's reference to "The value, if any, of the work performed by Protech" can reasonably be understood to mean the value of the work that Protech was not paid for, and not the value of all the work Protech did.

Cruz's seventh issue is without merit.

## D. Restoration of consideration under the DTPA

■■■ In his second issue, Cruz contends the trial court erred by failing to award him the DTPA remedy of restoration of consideration, even though the court granted Cruz summary judgment (1) that Cruz was a "consumer" under the DTPA, (2) that Protech and Martinez had violated the DTPA by violating section 41.007(a) of the property code, (3) that their violation was a producing cause of injury or harm to Cruz, and (4) that $1,059,940.52 would restore to Cruz all money paid to Protech and Martinez by him or on his behalf pursuant to the contracts that violated the DTPA. Cruz requested that relief in a posttrial "Motion for Court to Award Remedy of Restoration and Rescission," and also in his motion for judgment notwithstanding the verdict. The trial court denied both of those motions in the final judgment.

As previously noted, a violation of section 41.007(a) of the property code is a false, misleading, or deceptive practice

that is actionable under the DTPA. Tex. Prop.Code Ann. § 41.007(b). The remedies provision of the DTPA provides as follows:

(b) In a suit filed under this section, each consumer who prevails may obtain:

(1) the amount of economic damages found by the trier of fact . . . ;

(2) an order enjoining such acts or failure to act;

(3) orders necessary to restore to any party to the suit any money or property, real or personal, which may have been acquired in violation of this subchapter; and

(4) any other relief which the court deems proper. . . .

Tex. Bus. & Com.Code Ann. § 17.50(b) (Vernon Supp. 2009). The question presented is whether the trial court's summary-judgment rulings entitled Cruz to a recovery of $1,059,940.52 under section 17.50(b)(3).

Protech and Martinez argue that the trial court properly denied restoration to Cruz because he did not surrender the benefits he had received from them. Cruz replies that the DTPA does not require a claimant to restore benefits to the defendant as a prerequisite for the remedy of restoration, and alternatively that he is not retaining any benefits from Protech and Martinez because his house was ultimately demolished. We agree with Protech and Martinez.

We have interpreted section 17.50(b)(3) to incorporate the equitable doctrine of rescission, including the requirement that the claimant must surrender any benefits he received under the contract:

[R]estoration of the consideration paid, as authorized by subdivision (3) [of § 17.50(b)], is a statutory recognition of the equitable remedy of rescission and restitution, based on the theory that the complaining party may elect to avoid the contract, *surrender any benefits received,* and recover that [which] he parted with.

*Smith v. Kinslow,* 598 S.W.2d 910, 915 (Tex.Civ.App.-Dallas 1980, no writ). We enforced this rule in *David McDavid Pontiac, Inc. v. Nix,* 681 S.W.2d 831 (Tex. App.-Dallas 1984, writ ref'd n.r.e.). Nix bought a car from David McDavid Pontiac, used it for about a month, sued under the DTPA, and won a judgment for both actual damages and restoration. *Id.* at 833–34, 835. We reversed the award of restoration and rendered judgment that Nix take nothing on that theory of recovery because she failed to prove any tender or offer of tender of the value of using the car for a month. *Id.* at 836. Thus, under *Smith* and *David McDavid,* Cruz was obliged to prove and obtain a finding that he had surrendered or offered to surrender to Protech and Martinez the value of the services they provided at his house as a prerequisite for recovering under section 17.50(b)(3).

Cruz argues that we should depart from *stare decisis* on this occasion because *Smith* and *David McDavid* wrongly engrafted common-law rescission rules onto the new and independent remedy of restoration under the DTPA. But we are obliged to follow the law as set forth in our prior panel decisions unless the law is changed by this Court en banc or by a higher authority. *MobileVision Imaging Servs., L.L.C. v. LifeCare Hosps. of N. Tex., L.P.,* 260 S.W.3d 561, 566 (Tex.App.-Dallas 2008, no pet.). At oral argument, Cruz brought to our attention the case of *United Postage Corp. v. Kammeyer,* 581 S.W.2d 716 (Tex.Civ.App.-Dallas 1979, no writ), in which we affirmed an award based on section 17.50(b)(3) and did not mention any requirement that the plaintiff surrender the benefits received under the contract. *Id.* at 722–23. But the *United*

*Postage* opinion does not indicate that the defendant made Cruz's precise argument against restoration. Rather, the *United Postage* defendant apparently argued that the claimant had failed to prove a proper measure of damages by failing to prove the value of what he had received from the defendant. *Id.* at 722. The rule of *Smith* and *David McDavid* is not a measure-of-damages rule, but rather a separate and independent element of recovery under section 17.50(b)(3). Thus, *United Postage* is distinguishable.

Finally, Cruz argues that he conclusively showed he did not retain any benefits from Protech's and Martinez's services because the house was ultimately demolished. We do not agree that this fact proves compliance with *Smith* and *David McDavid.* There was some evidence that Protech's services at Cruz's house did in fact dehumidify the house and reduce the levels of mold in the house. Cruz did not demolish the house until 2005, at least a year and a half after Protech stopped performing its services in the house, so he continued to own the house for a significant length of time after Protech reduced the humidity and mold levels there. A reasonable person could conclude that Cruz derived some benefit from Protech's services at his house, and Cruz did not obtain a finding that the services were of no value or benefit to him. Thus, Cruz has not shown that the trial court erred by denying his request for restoration of consideration under § 17.50(b)(3) of the DTPA.

Cruz's second issue is without merit.

### E. Attorneys' fees under the DTPA

In his fourth issue, Cruz contends the trial court erred by failing to award him his attorneys' fees after granting him partial summary judgment that Protech and Martinez violated the DTPA. We reject this contention. "A party is not enti-

tled to a recovery of attorneys' fees [in a DTPA case] where a jury awards no damages." *Blue Star Operating Co. v. Tetra Techs., Inc.,* 119 S.W.3d 916, 922 (Tex. App.-Dallas 2003, pet. denied). The jury awarded no damages to Cruz on his DTPA claim, and we have affirmed the trial court's denial of a restoration remedy as well. The trial court did not err by failing to award him his attorneys' fees.

### F. Attorneys' fees for removal of liens

In his third issue on appeal, Cruz contends that the trial court erred by failing to award him his attorneys' fees after he prevailed on his claim to remove the liens. Cruz relies on a provision in the property code providing that "in any proceeding to declare that any lien or claim is invalid or unenforceable in whole or in part, the court may award costs and reasonable attorney's fees as are equitable and just." TEX. PROP.CODE ANN. § 53.156 (Vernon 2007). Protech responds that the trial court's denial of fees was not an abuse of discretion. *See Bocquet v. Herring,* 972 S.W.2d 19, 20 (Tex.1998) (holding that statutes providing that a court "may" award attorneys' fees are discretionary).

As noted in the factual recitation above, the trial court held two separate trials in this case. The first trial was a bench trial regarding the validity of certain liens, after which the court rendered judgment that the liens Protech had placed on Cruz's house were null and void. The court also severed that judgment so as to make it final. In the second trial, an attorney for Cruz testified about the amount of attorneys' fees Cruz had incurred in the case, and in the course of that testimony stated that "a fair and reasonable fee related just to the issue of removing those liens going to that trial is $72,500." The jury was not asked what a reasonable and necessary attorneys' fee would be for the legal ser-

vices that led to the removal of Protech's liens. In its final judgment, the trial court specifically ordered that Cruz recover no attorneys' fees for prevailing in the lien trial.

 We conclude Cruz has not shown that the trial court abused its discretion by denying him a recovery of fees relating to the removal of the liens. Any fee award had to be both reasonable and just. TEX. PROP.CODE ANN. § 53.156. The reasonableness of a particular amount of attorneys' fees "is a question of fact for the jury's determination." *Bocquet*, 972 S.W.2d at 21 (internal quotations and citations omitted). Whether an award of fees would be equitable and just is a matter addressed to the court's discretion. *Id.* "Unreasonable fees cannot be awarded, even if the court believed them just, but the court may conclude that it is not equitable or just to award even reasonable and necessary fees." *Id.* In this case, Cruz did not obtain a jury finding on the fact question of whether his attorneys' fees in pursuit of the lien judgment were reasonable. Moreover, the trial court reasonably could have concluded that Cruz's evidence of the reasonableness of the $72,500 figure was too conclusory. One of the four attorneys who worked on the case for Cruz testified about Cruz's attorneys' fees. Although the attorney testified about his background and experience, he did not testify about the number of hours spent on the lien-removal claim, nor did he offer any details about the work performed specifically on that part of the case. The court could reasonably have decided it would not be equitable and just to award any fee based on the quality of Cruz's evidence of the reasonableness of the amount sought, particularly without a jury finding of reasonableness in support. Its denial of fees was not an abuse of discretion.

We conclude that Cruz's third issue on appeal is without merit.

## G. Joint and several liability

In his eighth issue on appeal, Cruz contends the trial court erred by making him and Chubb jointly and severally liable to Protech in the judgment. We are rendering judgment that Protech take nothing on its claims against Chubb, which leaves only Cruz liable to Protech and eliminates his joint and several liability with Chubb. Cruz's eighth issue on appeal is moot.

## H. Judgment interest rate

In his first issue on appeal, Cruz argues the trial court erred by awarding Protech prejudgment and postjudgment interest at the rate of 6%. He contends the correct interest rate is 5%. Protech agrees. Accordingly, we will modify the judgment to reflect prejudgment and postjudgment interest rates of 5%. *See* TEX. FIN.CODE ANN. § 304.003 (Vernon 2006) (governing calculation of judgment interest rate).

## IV. PROTECH'S APPEAL

 Protech presents the same issue against both Chubb and Cruz: that the trial court erred by refusing to submit Protech's proposed jury question regarding its attorneys' fees for preparation and trial. Because we are reversing the judgment against Chubb and rendering judgment that Protech take nothing from Chubb, there is no basis for Protech to recover trial and preparation attorneys' fees against Chubb. We consider Protech's issue against Cruz only, and we conclude Protech failed to preserve error in the trial court.

The pertinent jury question is Question 14. A conditioning instruction told the jury to answer Question 14 if it had previously found that Cruz breached an agreement with Protech without any legal

excuse. Question 14 asked, "What is a reasonable fee for the necessary services of Protech's attorney in this case, stated in dollars and cents?" The question then instructed the jury to consider eight factors in making its finding, and it provided answer blanks for "an appeal to the Court of Appeals" and for "an appeal to the Supreme Court of Texas." It provided no answer blank for preparation and trial. We note that Question 5 was basically identical to Question 14 except that it was conditioned on previous findings in favor of Protech on its claims against Chubb instead of Cruz.

When a trial court omits a jury question, the party who relies on that question must tender that question in writing in substantially correct form and obtain a ruling in order to preserve error. *See* TEX.R. CIV. P. 278 (tender requirement); *id.* 276 (procedure for ruling on requests); *see also Johnson v. Johnson,* 869 S.W.2d 490, 492 (Tex.App.-Eastland 1993, writ denied) (stating error-preservation rule when trial court omits jury question). For its written tender, Protech cites only to a complete proposed jury charge that it filed before trial. That charge contained twenty-two proposed jury questions. Six of the proposed questions concerned Protech's attorneys' fees, and each of those six questions contained three blanks: one for fees for preparation and trial, one for fees for an appeal to the court of appeals, and one for fees for an 'appeal to the Texas Supreme Court. Each of the twenty-two proposed jury questions was followed by two blanks labeled "Granted" and "Denied." None of the blanks was marked by the trial judge. During the charge conference, Protech made only one objection:

> Your Honor, we would object to Question No. 5 and would submit that a ninth factor be added to the list of factors to be considered in determining the reasonableness of an attorney's fee award.

In that regard, I would propose that a No. 9 be added that would say whether the services rendered related to the prosecution of plaintiff's claims, which are recoverable, or the defense of defendant's counterclaims, which are not recoverable. I think that's an equitable way of pointing out the distinction, Your Honor. It gives the jury the latitude to distinguish and the latitude to—if they see fit to do so, to find a lesser amount, but to exclude the entirety is grossly inequitable and this is a fair middle ground, which I would ask the Court to consider. And depending on how the Jury's verdict comes up, the Court can always reconsider post verdict.

THE COURT: Okay. Anything else?

The Court later overruled all objections made by all parties.

Protech did not obtain a written ruling from the trial court refusing to submit a proposed jury question about Protech's attorneys' fees for preparation and trial. The question is whether the ruling on Protech's oral objection suffices. The supreme court has indicated that an oral ruling on a written request will suffice "when the court's refusal is otherwise clear from the record." *Dallas Mkt. Ctr. Dev. Co. v. Liedeker,* 958 S.W.2d 382, 387 (Tex. 1997) (per curiam), *overruled in part on other grounds by Torrington Co. v. Stutzman,* 46 S.W.3d 829, 840 n. 9 (Tex.2000). In *Liedeker,* the record reflected that the appellant submitted written requests to the trial judge, the judge said he would sign them later, and through inadvertence the judge never signed them. *Id.* at 385–86. The supreme court held that the trial court's "statements on the record clearly preserved [appellant]'s complaint." *Id.* at 387.

We conclude that the overruling of Protech's oral objection did not preserve error

as to the trial court's failure to submit a jury question asking about Protech's reasonable and necessary attorneys' fees incurred in suing Cruz. Protech's oral objection did not refer the court's attention to the pertinent jury question, Question 14. Protech's objection referred only to Question 5, which was connected with Protech's claims against Chubb rather than Cruz. Even if we were to construe Protech's oral objection as relating to Question 14 as well, the objection did not draw the court's attention to the specific defect Protech complains of on appeal—the omission of a blank asking the jury to find an amount of attorneys' fees for preparation and trial. Protech's objection related only to the omission of an instruction regarding a ninth factor for the jury to consider "in determining the reasonableness of an attorney's fee award." The trial court's overruling of this objection does not show that it was refusing to submit a jury question or blank regarding attorneys' fees incurred for preparation and trial, so *Liedeker* is inapplicable. Because the record does not show that Protech drew the trial court's attention specifically to Protech's written request for a jury question on preparation and trial attorneys' fees, the trial court's ruling did not preserve error on that point. *See Riddick v. Quail Harbor Condo. Ass'n, Inc.,* 7 S.W.3d 663, 675–76 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (holding that party's submission of complete proposed jury charge did not preserve error because there was no indication that the trial court ruled on any part of the tendered charge); *see also Coates v. Coates,* No. 05–08–00440–CV, 2009 WL 679592, at *2–3 (Tex.App.-Dallas Mar. 17, 2009, pet. denied) (mem. op.) (holding that submission of complete charge did not preserve error because party did not draw trial court's attention to specific part being urged on appeal).

We reject Protech's single issue on appeal.

## V. CONCLUSION

We reverse the judgment against Chubb and render judgment that Protech take nothing from Chubb. We modify the judgment against Cruz to provide that the prejudgment and postjudgment interest rate is 5% instead of 6%. In all other respects we affirm the judgment.