ACCEPTED
03-15-00447-CV
7895484
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/18/2015 5:32:08 PM
JEFFREY D. KYLE
CLERK

# No. 03-15-00447-CV

IN THE THIRD COURT OF APPEALS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/18/2015 5:32:08 PM
JEFFREY D. KYLE
Clerk

Austin Capital Collision, LLC,

Appellant,

v.

Barbara Pampalone,

Appellee.

On Appeal from D-1-GN-14-003207, in the 419th Judicial District Court, Travis County
Honorable Todd Wong, Presiding

## BRIEF OF APPELLANT AUSTIN CAPITAL COLLISION, LLC

LAW OFFICE OF MICHAEL S. TRUESDALE, PLLC
Michael S. Truesdale
State Bar No. 00791825
801 West Avenue, Suite 201
Austin, TX 78701
512-482-8671
866-847-8719 (fax)
mike@truesdalelaw.com
COUNSEL FOR APPELLANT
AUSTIN CAPITAL COLLSION, LLC

ORAL ARGUMENT NOT REQUESTED

# IDENTITY OF PARTIES AND COUNSEL

| | |
|---|---|
| Appellant | Austin Capital Collision, LLC |
| Appellant's Trial Counsel | SLATER PUGH LTD., LLP<br>Adam Pugh<br>apugh@slaterpugh.com<br>SBN 24044341<br>8400 N. Mopac Expressway, Suite 100<br>Austin, TX 78759<br>512-474-2431<br>512-472-0432 (fax) |
| Appellant's Appellate Counsel | LAW OFFICE OF MICHAEL S. TRUESDALE, PLLC<br>Michael S. Truesdale<br>mike@truesdalelaw.com<br>SBN 00791825<br>801 West Avenue, Suite 201<br>Austin, TX 78701<br>512-482-8671<br>866-847-8719 (fax) |
| Appellee | Barbara Pampalone |
| Appellee's Counsel | MCGINNISS LOCHRIDGE<br>Joe Lea<br>jlea@mcginnislaw.com<br>SBN12080200<br>Nelia J. Robbi<br>nrobbi@mcginnislaw.com<br>SBN 24052296<br>600 Congress Avenue, Suite 2100<br>Austin, TX 78701<br>512-485-6065<br>512-495-6093 (fax) |

**TABLE OF CONTENTS**

IDENTITY OF PARTIES AND COUNSEL ............................................................. i

TABLE OF CONTENTS ................................................................................... ii

INDEX OF AUTHORITIES ............................................................................. iv

STATEMENT OF CASE ................................................................................. v

STATEMENT REGARDING ORAL ARGUMENT ............................................... v

ISSUES PRESENTED .................................................................................. vi

INTRODUCTION ......................................................................................... 1

STATEMENT OF FACTS .............................................................................. 3

SUMMARY OF ARGUMENT .......................................................................... 9

ARGUMENTS AND AUTHORITIES .............................................................. 11
I.      Standard of Review ...........................................................................11
II.     The absence of a written agreement setting forth the terms of
        the loans at issue and signed by a purported debtor renders any
        alleged contract unenforceable ........................................................14
        A.      Plaintiff produced no writing sufficient to satisfy the
                statute of frauds in connection with the purported
                agreement she sought to enforce against the "owners" of
                Capital Collision ...................................................................14
        B.      Plaintiff failed to demonstrate the applicability of any
                exception to the statute of frauds sufficient to establish an
                enforceable obligation owed by the "owners" of Capital
                Collision, G.P. ......................................................................14
III.    Plaintiff failed to satisfy its burden of demonstrating how
        Austin Capital Collision, LLC could be liable in any event .........................16
        A.      It is conceded that Barbara Pampalone has no writing
                confirming that Austin Capital Collision LLC assumed
                the unwritten debt she claims to be owed by the "owners"
                (including her son) of Capital Collision, G.P. ...........................17
        B.      Plaintiff failed to establish any exception to the statute of
                frauds that would support a judgment against Austin
                Capital Collision LLC for a debt purportedly undertaken
                by a different entity ..............................................................18
IV.     The award of attorney's fees must be vacated ......................................19

PRAYER FOR RELIEF ................................................................................ 20

CERTIFICATE OF SERVICE ............................................................................... 21

CERTIFICATE OF COMPLIANCE ...................................................................... 21

APPENDIX ............................................................................................................ 22

# INDEX OF AUTHORITIES

## Cases

*BACM 2001-San Felipe Road Ltd. Partnership v. Trafalgar Holdings I, Ltd.*, 218 S.W.3d 137 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ................................................................................... 11

*Barbara Pampalone v. Eric Hinojosa and Austin Capital Collision, LLC*, No. D-1-GN-14-003297, in the 419th District Court, Travis County, Texas .............................................................................. iv

*Choi v. McKenzie*, 975 S.W.2d 740 (Tex. App. – Corpus Christi 1998, pet. denied) ...... 12

*Chubb Lloyds Ins. v. Andrew's Restoration*, 323 S.W.3d 564 (Tex. App. – Dallas 2010, pet. denied) ................... 18

*Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817 (Tex. 2012) ............................................................ 18

*Dynegy, Inc. v. Yates*, 422 S.W.3d 638 (Tex. 2013) ............................................................ 14

*Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429 (Tex. App.—Dallas 2002, pet. denied) ........... 9, 13, 19

*Hartford Fire Ins. v. C. Springs 300, Ltd.*, 287 S.W.3d 771 (Tex. App. – Houston [1st Dist.] 2009, pet. denied) ............................................................................... 18

*Taxel v. Bishop*, 201 S.W.3d 290 (Tex. App. – Dallas 2006, no pet.) ......................... 12

## Statutes

Tex. Bus. & Comm. Code § 26.01(a) ............................................................ 14
Tex. Bus. & Comm. Code § 26.01(b)(2) ...................................................... 18
Tex. Bus. & Comm. Code § 26.01(b)(6) ...................................................... 14

## STATEMENT OF CASE

*Nature of the case*    Barbara Pampalone sued Austin Collision Center, LLC and Eric Hinojosa, its proprietor, seeking to collect amounts she claimed remained due under an unwritten $80,000 loan she purportedly made to the owners (including her son) of a different entity called Capital Collision, G.P. *Barbara Pampalone v. Eric Hinojosa and Austin Capital Collision, LLC*, No. D-1-GN-14-003297, in the 419th District Court, Travis County, Texas.

*Course of proceedings*    The trial court conducted a one-day bench trial.

*Trial court's disposition*    The trial court rendered final judgment in favor of Pampalone and against Austin Capital Collision, LLC, awarding breach of contract damages in the amount of $56,758.68, trial court attorney's fees in the amount of $43,241.32, and conditional appellate attorney's fees. CR 50-51. The trial court entered findings of fact and conclusions of law in support of its judgment. CR at 53. Austin Collision Center, LLC timely filed a notice of appeal. CR 67.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Texas Rule of Appellate Procedure 38.1(e), Appellant submits that oral argument will not assist this Court with the resolution of this appeal. The theories raised on appeal are straight-forward, the disposition of which will not be materially aided by oral argument.

# ISSUES PRESENTED

I. The judgment against Austin Capital Collision, LLC constitutes error because it violates the statute of frauds:

<u>The underlying debt</u>

- The statute of frauds bars Plaintiff's claim seeking to enforce an unwritten, twenty-year loan contract that was never signed by any variation of entities against whom Plaintiff seeks to enforce the obligation (either the underlying general partnership, or the two corporations that owned that partnership, or the two individuals (including Plaintiff's son) who owned those corporate entities).

- The record does not support a "partial performance" exception to the statute of frauds to render enforceable such a loan because no evidence demonstrated that any purported performance was solely referable to the alleged oral contract.

<u>The assumption of the underlying debt and judgment against another entity</u>

- The statute of frauds bars Plaintiff's claim seeking to enforce an unwritten, twenty-year, loan purportedly entered into with a now-dissolved partnership or its now dissolved corporate partners, or the two individuals who owned those corporations (including Plaintiff's son), against a subsequently created entity, in the absence of a writing showing that any such obligation had been assumed by the new entity.

- The record does not support a "partial performance" exception to the statute of frauds that will allow the entry of judgment against Austin Capital Collision, LLC for a debt of another because no evidence demonstrated that any purported performance was solely referable to its assumption of any alleged oral contract undertaken by another entity.

II. The judgment awarding attorney's fees must be reversed in the absence of any theory for awarding actual damages

TO THE HONORABLE COURT OF APPEALS:

Appellant Austin Capital Collision, LLC files this Brief of Appellant, and in support states as follows:

**INTRODUCTION**

This case involves a claim seeking to enforce a purported loan contract that was never put into writing, against a party not created until years after-the-fact, and in the absence of any writing showing that entity assumed any obligation of the alleged underlying debtor. Barbara Pampalone asserted below that in 2005 she lent $80,000 to the "owners" of Capital Collision, G.P., a partnership owned by two corporate entities, which in turn were owned 50-50% by her son Erik Pampalone and Eric Hinojosa. But Pampalone produced no documentation demonstrating the existence of the "loan" or its terms, or rates. Barbara Pampalone conceded that all conversations she had about the purported loan were made with her son Erik, and the parties even stipulated that no written promissory note existed to substantiate the terms of any such loan. Pampalone's claim is necessarily unenforceable under the statute of frauds, as she presented no writing, signed by the party against whom enforcement was sought, substantiating the existence of a loan with a twenty-year pay off.

Making matters worse, Barbara Pampalone did not even sue the purported borrower to the alleged undocumented loan transaction. Instead, she sued what she asserted to be a successor company, Austin Capital Collision, LLC. The defect in this theory is that she again admitted no writing existed demonstrating that Austin Capital Collision, LLC assumed any obligations generally (unwritten or otherwise) of any earlier entity with whom she allegedly contracted. More importantly, the record did not establish that payments made by Austin Capital Collision LLC (the exception to the statute of frauds relied upon by the trial court) were solely referable to the assumption of a contract allegedly between Barbara Pampalone and the "owners" of Capital Collision, G.P. In fact, the record demonstrates that Erik Pampalone had previously asserted, in a separate lawsuit, that the unwritten transaction was not really a loan between his mother Barbara and the entities he jointly owed with Hinojosa, but was instead an unwritten personal loan from Erik Pampalone to Eric Hinojosa and that payments were due to him. The existence of that lawsuit necessarily defeats the strict "solely referable" element of the partial performance exception to the statute of frauds.

In the absence of (1) a writing establishing the existence of a "loan" with an initial entity, (2) evidence sufficient to invoke the partial

performance exception to the statute of frauds to render such an unwritten agreement enforceable, (3) a writing establishing that a successor entity assumed any obligation, and (4) evidence sufficient to invoke the partial performance exception to the statute of frauds to render such an unwritten agreement enforceable, the judgment twice runs afoul of the statute of frauds and must be reversed.

## STATEMENT OF FACTS

Erik Pampalone (Plaintiff's son) and Eric Hinojosa had been friends since childhood. 2RR 53-54. The two also became business partners, with each becoming the owner of 50% of entities that in turn owned Capital Collision, G.P.,[1] which operated pursuant to an assumed name certificate filed by Hinojosa using the name "Capital Collision". 2RR 172. When Erik Pampalone joined, he did not make a cash contribution, but he contributed access to his credit.[2] Hinojosa was the president, and Pampalone became vice president, and though he continued to live in California, Pampalone undertook responsibilities for the company's finances. 2RR 103. While he was not involved in the day-to-day operations at the shop, he had access to the bank accounts to set up automatic payments to pay bills. 2RR 104-05.

---

[1] Those two entities, formed around 2002-03, were Hinojosa Auto Body & Paint, Inc. (Texas), and Hinojosa Auto Body & Paint, Inc. (Nevada), sometimes collectively referred to as the "HABP Entities". *See* 2RR 171-72.
[2] Pampalone did testify that he made $2,000 contributions during certain months. 2RR 103.

3

Barbara Pampalone testified that in 2005, her son Erik told her Capital Collision was having difficult times financially, and approached her about a loan. 2RR 56. She did not know how the entities were organized nor did she know about the structure of the business relationships between Eric Hinojosa and her son. 2RR 55. Hinojosa was never a party to any loan-related talks with Barbara Pampalone, and any discussions she had remained between mother and son. 2RR 82, 84-85. Barbara Pampalone testified that she lent $80,000 to the owners of "Capital Collision" (which directly would presumably be Capital Collision, GP, in turn owned by the Texas and Nevada Hinojosa Auto Body & Paint, Inc. companies, which in turn were owned by Eric Hinojosa and Barbara Pampalone's son Erik). She testified that she made the loan in two phases – an initial $50,000 payment followed by a $30,000 payment. 2RR 58. But she also testified, and all stipulated, that what she asserted to be the loan to the company was not documented by any written promissory note, and that no writing existed to demonstrate the identity of the purported lender, the identity of the purported borrower, the amount of principal, the rate of interest or the duration of the loan. 2RR 61. When asked about the terms of the loan she testified she just had her son Erik set it up. 2RR 60. She recognized she could not produce any checks substantiating that she distributed any loan proceeds to a Capital Collision

entity. Instead, she wrote a $50,000 check to her son, 2RR 58, 84, and then wrote a check to another bank for the remaining $30,000. She had no documents showing how or when any money went to Capital Collision. 2RR 58-59. And she testified everything went through her son. R 85.

Bank accounts in the name of Capital Collision/Eric Hinojosa from 2005 listed a deposit in the amount of $50,000 from an entity called Metavante Corp. made on March 24, 2005. 3RR 8 (PX 1) Erik Pampalone testified that Metavante was affiliated with Quicken, and that the entry reflected a deposit he made of the loan proceeds he had received from his mother. 2RR 109, Ex. 1. Exhibit 2 also showed a $30,000 "Counter Credit" on April 13, 2005, but the bank statement gives no indication of the source of those funds. As Vice President with responsibility for accounting matters, Pampalone set up the accounts of Capital Collision so it would automatically make payments to his mother of approximately $675 per month from that same bank account.

In 2007, Erik Pampalone resigned as vice president and left Capital Collision, G.P. Eric Hinojosa testified that Erik Pampalone left because the business was in several lawsuits in which he wanted to have no involvement. 2RR 232. When he severed his ties with Capital Collision, Erik Pampalone left in place the automatic payments set up to be made from the Capital

5

Collision bank account, and those payments continued. He testified that upon his departure he assumed responsibility for repaying a different $45,000 loan made earlier by his mother to Capital Collision, G.P., but that the obligation to repay the $80,000 loan remained with Capital Collision, G.P. Even so, Barbara Pampalone testified she received nothing in writing from Capital Collision telling her it would pay any loan, and admitted Eric Hinojosa never told her he was committing to pay her back $80,000. 2RR 86-87. Hinojosa did testify that upon Pampalone's departure, Hinojosa personally took care of over $200,000 of then-existing debts belonging to the entities that Pampalone was leaving. 2 RR 233.

In 2009, Eric Hinojosa created a new entity called Austin Capital Collision, LLC , and then in 2010, he dissolved Capital Collision, G.P. and the two corporations that had owned it. Austin Capital Collision, LLC continued to make monthly payments to Barbara Pampalone via the auto-pay function that Erik Pampalone had created while serving as vice president. Eric Hinojosa testified that it continued to make the payments to help his childhood friend. 2RR 238-40. In April, 2013, Austin Capital Collision, LLC made its last monthly payment, and in October 2013 made a final payment of $6,000. Barbara Pampalone admitted that she was aware of

no written agreement by which Austin Capital Collision, LLC assumed any debt sued upon and that she was not a party to any such agreement.  2RR 98.

Ultimately, Barbara Pampalone and Erik Pampalone hired a lawyer in California.  That lawyer filed a lawsuit in the name of Erik Pampalone against Eric Hinojosa, claiming that the $80,000 had really been a loan from Erik Pampalone (not Barbara Pampalone) apparently to Eric Hinojosa personally (and not to Capital Collision, G.P., or its owners, the "HABP Entities," or Erik Pampalone or Eric Hinojosa, the owners of HABP owners) 2RR 92; 3RR 998 (DX1).  Erik Pampalone thus initiated a lawsuit claiming he was the maker of a loan (instead of being one of the borrowers).   As with his mother's later lawsuit, Erik' lawsuit relied upon an unwritten agreement, but claimed that the $675 monthly payments had been due to him rather than to his mother.  *Id*.  That case was ultimately nonsuited early on, after which Barbara Pampalone brought suit in Texas against Austin Capital Collision, LLC and Eric Hinojosa. CR 7.

After a one-day bench trial during which Barbara Pampalone, Erik Pampalone and Eric Hinojosa testified, the trial court rendered judgment against Austin Capital Collision, LLC.  CR 50.  It found that Barbara Pampalone had made a loan to the "owners" of Capital Collision, G.P., that the statute of frauds did not bar the claim even in the absence of a signed

7

promissory note, and that the loan could be enforced against Austin Capital Collision because it had partially performed. The trial court rendered judgment in favor of Barbara Pampalone in the amount of $56,758.68, as well as $43,241 in attorney's fees and an award of conditional appellate attorney's fees. CR 49-50.

In support of the judgment, the trial court entered findings of fact and conclusions of law. CR 53. Among other things, it found:

- In 2005, Eric Hinojosa was president and 50% shareholder of Hinojosa Auto Body & Paint, Inc. (Texas) and Hinojosa Auto Body & Paint, Inc. (Nevada) (the "HABP Entities"), and Erik Pampalone was the vice president and other 50% shareholder, with the two entities serving as general partners of Capital Collision, GP. Capital Collision, GP operated as "Capital Collision" pursuant to an assumed name filed by Eric Hinojosa. CR 54.

- In approximately March 2005, Plaintiff loaned $80,000 "to the owners of the Capital Collision business which, at the time were the HABP Entities as general partners of "Capital Collision, G.P" CR 54-55.

- There was no signed promissory note for the loan but the terms of the loan were evidenced by yearly amortization schedules. CR 56.

- The statute of frauds did not bar enforcement of the loan even though not in writing because Plaintiff performed and Defendant <u>Austin Capital Collision, LLC</u> partially performed. CR 56.

- In July 2009, Eric Hinojosa formed Austin Capital Collision, LLC, and serves as its sole managing member and 99% owner. CR 54.

- The HABP Entities and Capital Collision, G.P. were terminated in July 2010. CR 54.

- Following its formation, Austin Capital Collision, LLC assumed the loan to Plaintiff from the HABP Entities by continuing to make payments, partially performed on those obligations, and defaulted. CR 61-62.

## SUMMARY OF ARGUMENT

The trial court's liability judgment fails for two reasons.

First, any finding of an enforceable contract for a loan between Plaintiff and the owners of "Capital Collision" as defined by the court, runs afoul of the statute of frauds. There is no question that the purported loan transactions is subject to the statute of frauds – the agreement sued upon constitutes a purported loan obligation with a twenty-year term. The purported loan invokes the statute of frauds because the agreement sought to be enforced is not in writing and is not signed by the party against whom enforcement is sought. As the parties stipulated that no promissory note supported the purported loan transaction, it is unenforceable pursuant to the statute of frauds.

Plaintiff's claims are not saved by the defense of "partial performance". That theory is unavailable in the absence of evidence that any performance cited by Plaintiff "unequivocally referred" to the purported agreement and corroborated its existence, and that the performance "could have no other purpose" than to fulfill the agreement. *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439 (Tex. App.—Dallas 2002, pet. denied).

The record defeats the application of that theory – whether it shows a history of payments, the record does not contain evidence from the party allegedly making a contract that unequivocally refers to the purported agreement and corroborates its existence. Indeed, Erik Pampalone's California lawsuit against Eric Hinojosa calls into question whether <u>Plaintiff</u> even viewed the sued-upon loan as a contract existing between Barbara Pampalone and "Capital Collision." Under such circumstances, the doctrine of partial performance cannot save the transaction.

Second, assuming a finding about the existence of a loan between Plaintiff and the "owners" of "Capital Collision, G.P.", the judgment against the corporate entity Austin Capital Collision, LLC separately violates the statute of frauds. It is undisputed that Austin Capital Collision, LLC was not a party to the underlying agreement Plaintiff seeks to enforce (and did not even come into existence until years after that transaction purportedly occurred). While Austin Capital Collision, LLC uses the "Capital Collision" assumed name, nothing demonstrates that it acted as a surety for or adopted any debts of any predecessor entities. In fact, Barbara Pampalone admitted that no such writing established as much or that she was a party to any contract by which Austin Capital Collision, LLC agreed to pay any obligation owed by any other entity. Moreover, the record contains no

evidence that payments made by Austin Capital Collision were solely referable to the purported contract.  In the absence of such evidence, the partial performance theory on which the judgment against Austin Collision Center, LLC is based fails as a matter of law.

Finally, in the absence of any theory by which contractual claims could be sustained against Austin Collision Center, LLC, the award of attorney's fees necessarily must be rejected as well.  In short the judgment against  Austin Collision Center should be reversed in its entirety and judgment rendered in its favor on all claims.

ARGUMENTS AND AUTHORITIES

## I.    Standard of Review

The judgment below is predicated on the trial court's conclusion that the loan asserted by Pampalone satisfied the statute of frauds despite the conceded absence of a writing signed by "Capital Collision's" owners and despite the absence of a writing demonstrating that any such debt was assumed by Austin Capital Collision, LLC.  *See* CR 56, ¶ 17; 61, ¶51; 61-62, ¶¶ 54-55.  Accordingly, the judgment is based on a conclusion of law, subject to *de novo* review.  *See BACM 2001-San Felipe Road Ltd. Partnership v. Trafalgar Holdings I, Ltd.*, 218 S.W.3d 137, 143 (Tex. App. – Houston [14th Dist.] 2007, pet. denied) (judgment from a bench trial

11

predicated on a conclusion of law that an agreement satisfied statute of frauds held to be subject to *de novo* review). In conducting such review, the Court exercises its own judgment and re-determines each issue. *Id*.

Given the applicability of the statute of frauds as facially rendering unenforceable the underlying loan claim as well as the claim that any such loan was assumed by Austin Capital Collision, LLC, Plaintiff assumed the burden of proving the applicability of exceptions. *See Choi v. McKenzie*, 975 S.W.2d 740, 743 (Tex. App. – Corpus Christi 1998, pet. denied). Thus, given the stipulations of the parties and the evidence at trial, the focus of this appeal is not on whether the statute of fraud renders unenforceable any purported loan agreement between Plaintiff and "Capital Collision" or any assertion that such a loan had been assumed by Austin Capital Collision, LLC. Barring any applicable exceptions substantiated by the record, the answer to those questions are settled – any of the agreements on which the judgment below rely are unenforceable by operation of the statute of frauds. *Taxel v. Bishop*, 201 S.W.3d 290, 300 (Tex. App.—Dallas 2006, no pet.).

To support a judgment against Austin Capital Collision, LLC, Barbara Pampalone assumed the burden to establish two exceptions – first, a "partial performance" exception that would transform the unwritten purported loan agreement with unidentified parties into an enforceable contract, and second,

12

a partial performance exception that would allow liability under that unwritten agreement to be imposed upon Austin Capital Collision, LLC. The "partial performance" exception imposes an evidentiary burden of proving that the performance relied upon to allow invocation of the exception was "unequivocally referable" to the alleged agreement sued upon and corroborative of the fact a contract was actually made. *Breezevale*, 82 S.W.3d at 430. Moreover, the evidence must establish that the acts of performance relied upon could have been undertaken with no desire other than to fulfill the purported agreement sought to be enforced. *Id*.

In the absence of evidence that the actions relied upon by Barbara Pampalone were unequivocally referable, the invocation of the partial performance test fails under a legal sufficiency challenge. During the no evidence review the question is not whether there is evidence that the performance *could* have been referable to the contract, but whether the evidence that the performance was *solely* referable. *Id*. As the record conirms the absence of any evidence establishing the performance was solely referable to the contract, the judgment fails as a matter of law, and must be reversed in its entirety.

**II.**	**The absence of a written agreement setting forth the terms of the loans at issue and signed by a purported debtor renders any alleged contract unenforceable**

**A.**	**Plaintiff produced no writing sufficient to satisfy the statute of frauds in connection with the purported agreement she sought to enforce against the "owners" of Capital Collision**

The statute of frauds provides that certain types of agreements are unenforceable unless in writing and signed by the person to be charged with the agreement or a legally authorized representative. *See* Tex. Bus. & Comm. Code § 26.01(a); *see also Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 641 (Tex. 2013) (statute of frauds renders contract voidable and unenforceable against an objecting party). It is not disputed that the purported loan on which this lawsuit is based was never reduced to writing generally and in particular was never reflected by a writing signed by the purported debtors, the owners of Capital Collision, G.P. *See* 2RR 58; Tex. Bus. Comm. Code §§ 26.01(a), 26.01(b)(6). Thus, the purported agreement is unenforceable barring any evidence establishing an exception to the statute of frauds.

**B.**	**Plaintiff failed to demonstrate the applicability of any exception to the statute of frauds sufficient to establish an enforceable obligation owed by the "owners" of Capital Collision, G.P.**

As noted, all concede that the purported loan was not documented by a writing that would satisfy the statute of frauds. And the record does not

14

support the invocation of the partial performance exception as found by the trial court that would allow the contract to be enforced despite the statute of frauds. CR 61 (FOF 51).

Here, the trial court found that the statute of frauds did not bar a finding of an agreement between Barbara Pampalone and "Capital Collision" (as defined), because "Austin Capital Collision, LLC, d/b/a Capital Collision partially performed." CR 61 (FOF 54). Setting aside that this finding collapses the two 'partial performance' questions,[3] there is no evidence to support the application of the partial performance exception to establish the existence of an underlying loan agreement between Barbara Pampalone and the owners of Capital Collision, G.P.

Barbara Pampalone relies on the existence of numerous payments made over the years as constituting evidence of partial performance. But as noted, the question on appeal is not whether there is evidence that acts asserted to constitute partial performance *could be* referable to a contract. Instead, she must present proof that any performance was *solely* referable to the purported contract. *Breezevale*, 82 S.W.3d at 440. Here, the record

---

[3] These are: (1) whether partial performance allows for the avoidance of the statute of frauds in connection with determining whether an underlying agreement could be enforced, and (2) whether partial performance years later on the part of Austin Capital Collision, LLC allows for the avoidance of the statute of frauds and excuses the absence of a writing showing it assumed the debt of another.

contains no such evidence. The very fact that Erik Pampalone sued Eric Hinojosa claiming the existence of an $80,000 loan and entitlement to monthly payments of $675 defeats any conceivable argument that the evidence establishes the payments referenced by Barbara were <u>solely referable</u> to the unwritten agreement she seeks to enforce. Under *Breezevale*, her claim necessarily falls because no evidence supports her attempt to invoke the partial performance exception to the statute of frauds.

**III.  Plaintiff failed to satisfy its burden of demonstrating how Austin Capital Collision, LLC could be liable in any event**

As noted, Barbara Pampalone failed at trial to establish a theory by which it could have held Capital Collision, G.P. liable for the asserted loan in the absence of a writing satisfying the statute of frauds because she produced no evidence demonstrating that any partial performance by Capital Collision was <u>solely</u> undertaken in connection with the purported contract. The same defects defeat her efforts to enforce any purported loan obligations against Austin Capital Collision, LLC.

Barbara Pampalone stipulated she had no writing demonstrating that Austin Capital Collision, LLC assumed any obligation that she asserted previously belonged to the "owners of Capital Collision" (or to anyone else for that matter). That admission invokes the statute of frauds bar to

16

enforcing the assumption of a debut onto Austin Capital Collision, LLC. And in the absence of any such writing she cannot rely on a partial performance exception to render any assumption enforceable because she failed to present evidence demonstrating that the performance she cites was solely referable to the assumption by Austin Capital Collision, LLC of a contractual obligation owed by Capital Collision to Pampalone.

### A. It is conceded that Barbara Pampalone has no writing confirming that Austin Capital Collision LLC assumed the unwritten debt she claims to be owed by the "owners" (including her son) of Capital Collision, G.P.

It is undisputed that Barbara Pampalone can point to no writing by which Austin Capital Collision, LLC agreed to assume any obligations purportedly owed to her under an unwritten loan agreement made to the owners of Capital Collision, G.P., including her son. In fact, she stipulated that no such document exists and that she was not the subject to any such agreement with Eric Hinojosa on behalf of Austin Capital Collision, LLC. 2R 88. That fact demonstrates that, barring an exception, the statute of frauds bars any theory by which Barbara Pampalone could seek to impose liability on Austin Capital Collision, LLC for any purported loan between Barbara Pampalone and the "owners" of "Capital Collision, G.P."

17

**B.** **Plaintiff failed to establish any exception to the statute of frauds that would support a judgment against Austin Capital Collision LLC for a debt purportedly undertaken by a different entity**

Nor does the record support the trial court's conclusion that Austin Collision Center, LLC can be liable under a partial performance theory. In the face of the stipulation that no writing or contract exists demonstrating Austin Capital Collision, LLC assumed any loan from the "owners" of Capital Collision, G.P.,[4] the trial court relied on two intertwined theories to hold it liable, but both fail. The conclusion that Austin Capital Center, LLC made an unwritten assumption of obligations of Capital Center, GP depends upon the "partial performance" exception to avoid the statute of frauds because no agreement demonstrating any assumption appears in writing. *See* CR 61 (COL 54) ("Austin Capital Collision, LLC d/b/a/ Capital Collision assumed the loan from the HAPB Entities though [sic] its conduct and course of performance, *including by continuing to make payments on the loan in accordance with the terms of the agreement.*"). (emphasis added).

---

[4]Another type of agreement that must meet the requirements of the statute of frauds is a promise by one person to answer for the debt of another. TEX. BUS. & COMM. CODE § 26.01(b)(2); *see Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 827 (Tex. 2012); *Chubb Lloyds Ins. v. Andrew's Restoration*, 323 S.W.3d 564, 571-572 (Tex. App. – Dallas 2010, pet. denied); *Hartford Fire Ins. v. C. Springs 300, Ltd.*, 287 S.W.3d 771, 777 (Tex. App. – Houston [1st Dist.] 2009, pet. denied).

The partial performance theory fails as a matter of law because the record contains no evidence that any payments referred to were solely referable to the loan in question. As noted, to the extent even Erik Pampalone asserted that the historical payments were in satisfaction of a debt owed to him by Eric Hinojosa, there is no evidence that the payments were instead solely referable to the assumption of a debt by Austin Capital Collision, LLC, previously owed by the owners of Capital Collision, GP (including Erik Pampalone), to Barbara Pampalone).

Indeed, the record further confirms that Austin Capital Collision, LLC did not undertake to make payment, and in fact never made a payment to, Barbara Pampalone, as every payment referenced was made from an account in the name of <u>Eric Hinojosa</u> and <u>Capital Collision, G.P</u>., and not Austin Capital Collisionn, LLC. *See* 3RR 19-21 (Ex. 3). The absence of evidence of performance by <u>Austin Capital Collision</u> thus independently undermines any attempt to defeat the statute of frauds and hold Austin Capital Collision, LLC liable for an unwritten loan to the owners of Capital Collision, G.P. *See Breezevale*, 82 S.W.3d at 439.

## IV.  The award of attorney's fees must be vacated

Finally, to the extent the preceding arguments defeat Pampalone's claims against Austin Capital Collision, LLC, the award of attorney's fees

19

must also be vacated. In the absence of a liability claim decided in her favor, Pampalone is not entitled to an award of attorney's fees. Accordingly, Austin Collision Center, LLC requests that those fees be vacated as well.

## PRAYER FOR RELIEF

Austin Collision Center, LLC respectfully prays that this Court reverse the judgment below, and render judgment that Barbara Pampalone take nothing by her claims, that costs be taxes against Pampalone, and for whatever additional relief to which Austin Collision Center may be entitled.

Respectfully submitted,

*/s/ Michael S. Truesdale*
Michael S. Truesdale

LAW OFFICE OF MICHAEL S. TRUESDALE, PLLC
State Bar No. 00791825
801 West Avenue, Suite 201
Austin, TX 78701
512-482-8671
866-847-8719 (fax)
mike@truesdalelaw.com
COUNSEL FOR APPELLANT

## CERTIFICATE OF SERVICE

On November 18, 2015, the undersigned certifies that he served a copy of this Brief of Appellants on the following in the manner listed below, in compliance with Texas Rules of Appellate Procedure 9.5 and 25.1(e):

MCGINNISS LOCHRIDGE
Nelia J. Robbi
nrobbi@mcginnislaw.com
SBN 24052296
600 Congress Avenue, Suite 2100
Austin, TX 78701
512-485-6065
512-495-6093 (fax)

*Counsel for Barbara Pampalone*
*Via e-service*

/s/  Michael S. Truesdale
Michael S. Truesdale
SBN 00791825

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the word limitation contained in Texas Rule of Appellate Procedure 9.4(i)(2)(E) in that the brief contains a total of 4,404 words, excluding parts of the brief exempted by Tex. R. App. P. 9.4(i)(1), as calculated by the word count tool of Microsoft Word (2008) for Mac.

/s/ Michael S. Truesdale
Michael S. Truesdale

**APPENDIX**

Tab 1        Final Judgment (CR 50-52)

Tab 2        Findings of Fact and Conclusions of Law (CR 53-63)

Tab 3        *Exxon Corp. v Breezevale, Ltd.*, 82 S.W.3d 429 (Tex. App—Dallas 2002, pet denied)

# Tab 1

Filed in The District Court
of Travis County, Texas

**JUN 18 2015**

At _____ 2:46 PM.
Velva L. Price, District Clerk

NO. D-1-GN-14-003207

| | | |
|---|---|---|
| BARBARA PAMPALONE, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ERIC HINOJOSA AND AUSTIN | § | |
| CAPITAL COLLISION, LLC, | § | |
| | § | |
| *Defendants.* | § | 419TH JUDICIAL DISTRICT |

## FINAL JUDGMENT

On June 8, 2015, this case was called for trial. Plaintiff Barbara Pampalone appeared in person and announced ready for trial. Defendant Eric Hinojosa appeared in person and announced ready for trial. Defendant Austin Capital Collision, LLC, appeared through its representative, Eric Hinojosa, and announced ready for trial.

All matters in controversy, legal and factual, were submitted to the Court for its determination. The Court heard the evidence and arguments of counsel and announced its decision for Plaintiff Barbara Pampalone.

The Court orally RENDERED judgment for Plaintiff Barbara Pampalone and against Defendant Austin Capital Collision, LLC, on June 8, 2015, and this written judgment memorializes that rendition.

IT IS THEREFORE ORDERED that Plaintiff recover the following from Defendant Austin Capital Collision, LLC:

1. Actual damages in the amount of $56,758.68;

2. Plus reasonable and necessary attorneys' fees in the amount of $43,241.32; plus

3. Post-judgment interest at the rate of 5.0%, compounded annually from the date this judgment is entered until all amounts are paid in full.



004080302



50

It is further ORDERED that Defendants take nothing.

It is further ORDERED that if Defendant Austin Capital Collision, LLC, unsuccessfully appeals this judgment to an intermediate court of appeals, Plaintiff Barbara Pampalone will additionally recover from Defendant Austin Capital Collision, LLC, the amount of $20,000.00, representing the anticipated reasonable and necessary fees and expenses that would be incurred by Plaintiff in defending the appeal.

It is further ORDERED that if Defendant Austin Capital Collision, LLC, unsuccessfully appeals this judgment to the Texas Supreme Court, Plaintiff Barbara Pampalone will additionally recover from Defendant Austin Capital Collision, LLC, the amount of $20,000.00, representing the anticipated reasonable and necessary fees and expenses that would be incurred by Plaintiff in defending the appeal.

It is further ORDERED that Plaintiff may have all writs, orders and executions necessary for collection of this judgment, which may issue immediately.

It is further ORDERED that except as specifically provided herein, all relief not expressly granted is hereby DENIED.

This judgment finally disposes of all parties and all claims and is appealable.

SIGNED this __18__ day of June, 2015.

THE HONORABLE TODD WONG

2

# Tab 2

Filed in The District Court
of Travis County, Texas

JUL - 7 2015

At 3:45 p.m.

Velva L. Price, District Clerk

| BARBARA PAMPALONE, | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ERIC HINOJOSA AND AUSTIN | § | |
| CAPITAL COLLISION, LLC, | § | |
| | § | |
| *Defendants.* | § | 419TH JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. Introduction

On June 8, 2015, this case was called for trial, and all matters in controversy, legal and factual, were submitted to the Court for its determination. In addition to all other findings necessary to support the Judgment rendered in favor of Plaintiff and against Defendant Austin Capital Collision, LLC, in this cause, the Court hereby makes and files the following specific findings of fact and conclusions of law. Any finding of fact that should be construed as conclusion of law is hereby adopted as such. Any conclusion of law that should be construed as a finding of fact is hereby adopted as such.

### II. Findings of Fact

*A. Procedural History.*

1. Plaintiff Barbara Pampalone ("Plaintiff") filed her original petition on August 26, 2014, alleging causes of action for breach of contract against Defendant Eric Hinojosa and Defendant Austin Capital Collision, LLC.

2. This is an expedited action under Texas Rule of Civil Procedure 169.

3. This case was called for bench trial on June 8, 2015, and the parties appeared and announced ready for trial. At the close of trial, judgment was rendered in favor of Plaintiff and



004108045



53

against Defendant Austin Capital Collision, LLC. Judgment was signed on June 18, 2015.

4. Defendants requested findings of fact and conclusions of law on June 18, 2015.

**B. *The Parties and Associated Persons/Entities.***

5. Defendant Eric Hinojosa is a resident of Texas. Eric Hinojosa previously lived in California where he and Plaintiff's son, Erik Pampalone, became friends.

6. Plaintiff is a semi-retired dentist who resides in Chatsworth, California.

7. In 2005, when the loan at issue in this lawsuit was made, Eric Hinojosa was the president and a 50% shareholder of Hinojosa Auto Body & Paint, Inc. (Texas), and Hinojosa Auto Body & Paint, Inc. (Nevada), (collectively, the "HABP Entities"). Plaintiff's son, Erik Pampalone, was the vice president and other 50% shareholder of the HABP Entities. The HABP Entities were the general partners of Capital Collision, G.P., and the business—auto body repair shop—operated under the assumed name filed by Eric Hinojosa of Capital Collision [Exh. P-19]. The HABP Entities were terminated in July of 2010 and, accordingly, the general partnership of Capital Collision, G.P. was also terminated.

8. Prior to the termination of the HABP Entities in 2010, Eric Hinojosa formed Defendant Austin Capital Collision, LLC, in June of 2009. Eric Hinojosa is the sole managing member and 99% owner of Austin Capital Collision, LLC, which is also engaged in auto body repair. On the same day that Austin Capital Collision, LLC, was formed, Defendant Eric Hinojosa filed an assumed name certificate on behalf of Austin Capital Collision, LLC, for the name "Capital Collision." Austin Capital Collision, LLC, continues to conduct business today as Capital Collision.

**C. *The Loan Agreement.***

9. Around March of 2005, Plaintiff loaned the principal sum of $80,000.00 to the owners of

2

the Capital Collision business which, at the time, were the HABP Entities as general partners of Capital Collision, G.P. The owners of the Capital Collision business are referred to herein as "Capital Collision."

10. At the time, Capital Collision had an option to purchase the land it was renting but lacked the necessary funds. Erik Pampalone and Eric Hinojosa, as corporate officers/directors, discussed the issue, and Erik Pampalone suggested to Eric Hinojosa that he could ask his mother, Plaintiff, to loan the funds to Capital Collision. Eric Hinojosa agreed that Erik Pampalone should ask Plaintiff to loan funds to Capital Collision.

11. Erik Pampalone, in his capacity as Vice-President of Capital Collision, approached Plaintiff and proposed that Plaintiff loan Capital Collision the sum of $80,000.00 and, in exchange, Capital Collision would repay the $80,000.00 over a twenty year period, plus annual interest at the rate of 7%.

12. Plaintiff understood, and Capital Collision agreed, that the loaned funds would be used for business purposes, including the possible purchase of land.

13. Plaintiff had previously loaned funds to Capital Collision for business purposes in 2003 and, at the time of the loan at issue in this lawsuit, was being repaid by Capital Collision as agreed.

14. Plaintiff agreed to loan $80,000.00 to Capital Collision. Plaintiff performed under the terms of the agreement and paid the funds to Capital Collision in two installments: $50,000.00 on or about March 24, 2005, and the remaining $30,000.00 on or about April 13, 2005. [Exhs. P-1, P-2].

15. The loaned funds were deposited into Capital Collision's bank account, a Bank of America account held in the names of "Capital Collision" and "Eric Hinojosa."

3

16. The parties have stipulated that there is no signed promissory note for the loan. However, the terms of the loan were evidenced in yearly loan amortization schedules generated by Erik Pampalone and sent to Defendants and their representatives. [Exhs. P-5, P-7, P-9, P-12, P-12A, P-13, P-15, P-16, P-17].

17. The statute of frauds does not bar the agreement, even though it is not in writing, because Plaintiff fully performed under the agreement, and Defendant Austin Capital Collision, LLC, partially performed.

**D.  Payments on the Loan.**

18. Thereafter, beginning on or about May 20, 2005, Capital Collision began performing under the agreement by making monthly payments on the loan pursuant to the agreed upon terms. Payments were made by electronic bill payment from Capital Collision's Bank of America account held in the names of "Eric Hinojosa" and "Capital Collision" into Plaintiff's bank account.

19. The parties stipulated that from May 2005 through April 2013, Plaintiff received 94 monthly payments on the loan. [Exhs. P-3, P-3A].

20. The 94 monthly payments were made by Capital Collision to Plaintiff as repayment on the loan.

21. During this time period, there was email correspondence among the parties and persons acting on their behalf acknowledging the existence of the loan and Defendants' indebtedness to Plaintiff thereunder. [Exhs. P-5, P-7, P-8, P-9, P-10, P-11, P-12, P-12A, P-13, P-15, P-16, P-17].

**E.  Defendant Austin Capital Collision's Assumption of the Loan.**

22. Erik Pampalone began the process of leaving Capital Collision in 2006, and he formally resigned in approximately April of 2007. After resigning, Erik Pampalone assisted Plaintiff in

4

oversight of repayment of the loan, corresponding by telephone and email with Defendant Eric Hinojosa and other Capital Collision employees concerning the loan.

23. Following Erik Pampalone's resignation, Defendant Eric Hinojosa became and remained the sole officer/director of Capital Collision. Capital Collision continued to repay the Loan to Plaintiff pursuant to the agreed upon terms.

24. In June of 2009, Defendant Eric Hinojosa formed a new company, Defendant Austin Capital Collision, LLC, [Exh. P-20] which became the owner of the Capital Collision business and filed an assumed name of "Capital Collision." [Exhs. P-21, 22].

25. Following its formation, Defendant Austin Capital Collision, LLC, assumed the loan to Plaintiff.

26. Approximately one year later, in July of 2010, Defendant Eric Hinojosa terminated the HABP Entities (and, accordingly, the general partnership). [Exh. P-24].

27. At the time of termination of the HABP Entities and formation of Austin Capital Collision, LLC, all entities were operated solely by Defendant Eric Hinojosa.

28. Defendant Eric Hinojosa did not provide notice—statutory or otherwise—to Plaintiff or Erik Pampalone that he was terminating the HABP Entities or that Capital Collision was owned or being operated by a new entity, Austin Capital Collision, LLC.

29. Although there was no formal purchase or transfer of assets between Austin Capital Collision, LLC, and the HABP Entities, Austin Capital Collision, LLC, continued to use the same assumed name, business email address (cptlcollision@aol.com) and email signature block (with the same name and physical address) as the as the HABP Entities [Exh. P-14]. Austin Capital Collision, LLC, also retained some of the same employees, took over control of the bank accounts of the HABP Entities, and operated the same general business as the HABP Entities.

5

30. Prior to institution of this lawsuit, neither Plaintiff nor Erik Pampalone was aware or had any reason to be aware that the HABP Entities had been terminated or that a new entity, Austin Capital Collision, LLC, was operating the business and using the assumed name of Capital Collision.

31. Following formation of Austin Capital Collision, LLC, and termination of the HABP Entities, Austin Capital Collision, LLC, d/b/a Capital Collision continued to make payments to Plaintiff pursuant to the agreed upon terms of the loan.

32. Austin Capital Collision, LLC, d/b/a Capital Collision made its payments from the Bank of America account held in the names of "Eric Hinojosa" and "Capital Collision" until approximately March of 2010 when the payments began being made from a Bank of America account held in the names of "Eric Hinojosa" and "Capital Collision GP." Because the payments were electronically deposited into Plaintiff's bank account, Plaintiff was not aware of any change in the bank account making the payments to her.

33. Defendant Austin Capital Collision, LLC, d/b/a Capital Collision was operating the Bank of America accounts making the payments to Plaintiff. Its sole managing member and majority owner, Defendant Eric Hinojosa, intentionally put money into the Bank of America account held in the names of "Eric Hinojosa" and "Capital Collision, GP" to cover the monthly bill payments to Plaintiff on the loan.

34. After Austin Capital Collision, LLC, was formed, Erik Pampalone, acting on behalf of Plaintiff, continued to send correspondence concerning Plaintiff's loan to the cptlcollision@aol.com email address. [Exhs. P-12a, P-13, P-14]. In response, Austin Capital Collision, LLC, d/b/a Capital Collision continued to make payments on the loan as agreed. [Exhs. P-3, P-3A].

6

35. In September of 2012, Erik Pampalone, acting on behalf of Plaintiff, sent an email to cptlcollision@aol.com requesting that Eric Hinojosa change where he was sending the monthly deposits to Plaintiff on her loan to Capital Collision. [Exh. P-14]. In response, Mirium Matta, Eric Hinojosa's sister-in-law and an employee of Austin Capital Collision, LLC, responded from the cptlcollision@aol.com email with "received and updated." [Exh. P-14].

36. Austin Capital Collision, LLC, acknowledged the loan to Plaintiff and its indebtedness thereunder through its conduct and course of performance.

### F. Austin Capital Collision, LLC's, Default on the Loan.

37. Defendant Austin Capital Collision, LLC, d/b/a Capital Collision made its last regular monthly payment on the loan in April of 2013. [Exhs. P-3, P-3A].

38. In October of 2013, Austin Capital Collision, LLC, d/b/a Capital Collision made a payment of $6,000.00 to Plaintiff. [Exhs. P-3, P-3A]. No further payments have been made to Plaintiff. Austin Capital Collision, LLC, d/b/a Capital Collision has breached and defaulted on the loan to Plaintiff.

39. Plaintiff made demand for payment upon Defendants, but Defendants failed and refused to cure the default on the loan. [Exhs. P-16, P-25].

### G. Plaintiff's Damages.

40. As a result of Defendant Austin Capital Collision, LLC's, default on the loan to Plaintiff, Plaintiff has suffered damages.

41. The parties stipulated that the amount due and owing on the loan as of the date of trial is $56,758.68.

### H. Attorneys' Fees.

42. As a result of Defendants' default, Plaintiff was compelled to file the instant lawsuit and

7

incur attorneys' fees and costs associated with same.

43. Through April 2015, Plaintiff incurred attorneys' fees in the amount of $44,950.30. [Exh. P-18]. Plaintiff's fees incurred through trial are in excess of $90,000.00. These fees are reasonable and necessary in Travis County, Texas.

44. The parties stipulated to Ms. Robbi's qualifications to present attorneys' fees testimony and the reasonableness of the hourly rates being charged.

45. Plaintiff's attorneys were required to expend significant time engaging in discovery, drafting and filing a motion to dismiss claims asserted by Defendants, compelling discovery from Defendants, attempting to subpoena documents from Defendants' accountant, preparing for and attending depositions and mediation, attending hearings on Defendants' special exceptions and motion for continuance, preparing for and attending trial, and drafting pre-trial motions, including a motion to exclude the testimony of Defendant's corporate representative, Eric Hinojosa, who was wholly unprepared for his deposition in which it was agreed he would provide answers in his individual capacity and as the corporate representative for Defendant Austin Capital Collision, LLC.

46. Plaintiff's reasonable and necessary fees for Travis County in the event of an unsuccessful appeal by either Defendant to the Court of Appeals are $20,000.00.

47. Plaintiff's reasonable and necessary fees for Travis County in the event of an unsuccessful appeal by either Defendant to the Texas Supreme Court are $20,000.00.

## I. Other Findings by the Court.

48. Defendant Eric Hinojosa lacks credibility, especially in light of the fact that Eric Hinojosa was wholly unprepared for his corporate representative deposition, had not reviewed a single document produced in the lawsuit or otherwise talked to any Austin Capital Collision, LLC,

employees or representatives regarding the designated deposition topics, and demonstrated a repeated inability to provide substantive responses on his own behalf or on behalf of Austin Capital Collision, LLC. Further, at trial of this cause, Eric Hinojosa tried to change many of the answers he provided at his deposition which occurred approximately one month before trial.

## III. Conclusions of Law

### A. *Breach of Contract.*

49. Plaintiff and Capital Collision ("Capital Collision," as indicated, *supra*, referring to the owners of the Capital Collision business which, at the time, were the HABP Entities as the general partners of Capital Collision, G.P.) intended to and did enter into an agreement whereby Plaintiff would loan the sum of $80,000.00 to Capital Collision and, in exchange, Capital Collision would repay the loan over 20 years at 7% interest.

50. This agreement constitutes a valid, enforceable contract.

51. The statute of frauds does not bar the agreement, even though it is not in writing, because Plaintiff fully performed under the agreement, and Defendant Austin Capital Collision, LLC, d/b/a Capital Collision partially performed.

52. Plaintiff fully performed under the terms of the agreement, paying the sum of $80,000.00 to Capital Collision.

53. Capital Collision performed on the agreement prior to the termination of the HABP Entities by making monthly payments on the loan as agreed.

54. Austin Capital Collision, LLC, d/b/a Capital Collision assumed the loan from the HABP Entities though its conduct and course of performance, including by continuing to make payments on the loan in accordance with the terms of the agreement.

55. Austin Capital Collision, LLC, d/b/a Capital Collision partially performed on the agreement

9

by continuing to make payments on the loan to Plaintiff in accordance with the terms of the agreement.

56. Austin Capital Collision, LLC, defaulted on the loan.

57. As a result of Austin Capital Collision, LLC's, default, Plaintiff suffered damages in the amount of $56,758.68. Accordingly, Plaintiff is entitled to recover the sum of $56,758.68 from Defendant Austin Capital Collision, LLC.

58. Plaintiff is entitled to post-judgment interest at the rate of 5%.

### B. Attorneys' Fees.

59. Because this is an expedited action under Texas Rule of Civil Procedure 169 and Plaintiff cannot recover more than $100,000.00 inclusive of attorneys' fees, Plaintiff is entitled to attorneys' fees in the amount of $43,241.32 which fees are reasonable and necessary in Travis County, Texas.

60. Plaintiff is entitled to a conditional award of $20,000.00 in the case of an unsuccessful appeal by either Defendant to the Court of Appeals. This sum is reasonable and necessary in Travis County, Texas.

61. Plaintiff is entitled to an additional conditional award of $20,000.00 in the case of an unsuccessful appeal by either Defendant to the Texas Supreme Court. This sum is reasonable and necessary in Travis County, Texas.

### C. Defendants' Affirmative and Other Defenses.

62. All of Defendants' affirmative or other defenses as alleged in its Fourth Amended Original Answer, Verified Denial and Special Exceptions lack merit and any relief associated with same is expressly denied.

63. Any conclusion of law deemed a finding of fact is hereby adopted as such.

SIGNED this _7th_ day of July, 2015.

                                                                          THE HONORABLE TODD WONG

# Tab 3

Page 429

**82 S.W.3d 429 (Tex.App. —Dallas 2002)**

**EXXON CORPORATION, Appellant,**

**v.**

**BREEZEVALE LIMITED, Appellee.**

**No. 05-98-02050-CV.**

**Court of Appeals of Texas, Fifth District, Dallas**

**April 4, 2002**

Page 430

[Copyrighted Material Omitted]

Page 431

[Copyrighted Material Omitted]

Page 432

[Copyrighted Material Omitted]

Page 433

David J. Beck, Beck Redden & Secrest, L.L.P., Houston, Nina Cortell, Haynes & Boone, L.L.P., Dallas, for Appellant.

Stephen D. Susman, Susman Godfrey, L.L.P., Houston, for Appellee.

Before Justices BRIDGES, FITZGERALD, and FARRIS. [1]

**OPINION**

Opinion By Justice David F. FARRIS (Retired).

Exxon Corporation (Exxon) appeals the trial court's judgment following a jury verdict awarding Breezevale Limited (Breezevale) $34.3 million as damages for breach of an oral contract, $1 million for breach of a contract implied in law, and $3.495 million in attorneys' fees. In its first three issues, Exxon asserts (1) the evidence is legally and factually insufficient to support a finding that the parties reached an enforceable oral agreement, (2) the claimed agreement is not enforceable under the statute of frauds, and (3) the trial court incorrectly instructed the jury regarding the doctrine of promissory estoppel. In its

Page 434

final five issues, Exxon complains about the lost profits award, the attorneys' fees award, some of the trial court's evidentiary rulings, and the judgment being contrary to public policy.

Breezevale brings three issues in a cross appeal. Breezevale first contends the trial court erred in its calculation of interest on the breach of contract award. In two conditional cross-points, Breezevale complains of the trial court's dismissal of its breach of fiduciary duty claim by directed verdict and the trial court's exclusion of evidence.

For the reasons that follow, we reverse the trial court's award of $34.3 million on Breezevale's breach of contract claim, affirm the award of $3.495 million in attorneys' fees, and affirm the trial court's directed verdict on Breezevale's breach of fiduciary duty claim. [2]

**FACTUAL BACKGROUND**

In the early 1990s, the Nigerian government opened its deepwater offshore to oil and gas

exploration, inviting bids from international oil companies for deepwater blocks. Exxon submitted a bid requesting blocks 209 and 210. In June 1993, the Nigerian government formally awarded block 209 to Exxon. Exxon subsequently leveraged some of its interest in block 209, through trades and farm-ins, to acquire interests in other blocks that had been awarded to other companies.

This case arises from a dispute between Exxon and Breezevale, a company hired by Exxon to provide local assistance in its effort to procure exploration rights in Nigeria. Breezevale, a London-based corporation, operated in various countries in Europe, the Middle East, and Africa, including Nigeria. Exxon contacted Breezevale in 1990, requesting its assistance with services such as arranging appointments, conducting briefings, obtaining information and technical data on available blocks of interest to Exxon, and speaking with government officials on Exxon's behalf. Breezevale provided these types of services to Exxon over a period of approximately eighteen months, with no formal agreement in place as to Breezevale's compensation for its services. As the business relationship progressed, the parties began negotiating the terms of a contract to formalize their relationship. Although Exxon initially pursued only a short-term services agreement with Breezevale, Breezevale expressed an interest in a more involved, long-term relationship in which Breezevale would share the risk and rewards of Exxon's Nigerian exploration. Representatives of Exxon and Breezevale met several times to discuss their business relationship.

The last of these meetings occurred on April 3, 1992. In this and previous meetings, the parties discussed both a services contract and a participation agreement. The parties discussed different options that would provide Breezevale with a participation interest in Exxon's Nigerian exploration and production, including a 2 1/2 percent paid working interest, whereby Breezevale would pay 2 1/2 percent of the costs of production and receive 2 1/2 percent of the production profits. The parties' dispute as to whether an oral working interest agreement was reached at the April 3rd meeting became the basis for Breezevale's lawsuit against Exxon. Breezevale claimed Exxon offered, and it accepted, a 2 1/2 percent working interest in all of Exxon's Nigerian oil operations. Exxon

Page 435

claimed an agreement on essential terms was never reached and it terminated negotiations with Breezevale before a contract was formed. Neither party disputes an agreement on the services contract was never reached.

The day after the April 3, 1992 meeting, Exxon's main contact at Breezevale, Habib Bou-Habib, traveled to Nigeria to speak with the Ministry of Petroleum on Exxon's behalf. Breezevale contends the trip was made at the request of Exxon; Exxon asserts it never requested nor authorized the visit. On April 9, 1992, Habib contacted Gerald Mudd, an Exxon representative, telling him to "[g]o open the champagne," because Exxon had been awarded a block. Block 209 was formally awarded to Exxon by the Nigerian government in June 1993.

On April 13, 1992, Exxon sent Breezevale a letter terminating its relationship with Breezevale and enclosing a $30,000 check to cover Breezevale's services. According to Mudd, Exxon had begun to have concerns about Habib's actions in Nigeria; consequently, Exxon decided to terminate the business relationship. Habib returned the check.

Breezevale sued Exxon, claiming, among other things, that Exxon breached its oral contract

with Breezevale and its fiduciary duty to Breezevale. The case was tried to a jury. After Breezevale rested its case, Exxon moved for a directed verdict on all counts. The trial court granted Exxon's motion for a directed verdict with regard to Breezevale's breach of fiduciary duty claim, but denied the remainder of the motion. The jury found the parties had entered into an oral agreement that Breezevale would acquire a 2 1/2 percent working interest in "any deepwater blocks awarded to Exxon by the government of Nigeria" and "any deepwater blocks in which Exxon obtains a farm-in from a private company by trading any interest awarded to Exxon by the government of Nigeria." The jury valued the working interest at $34.3 million and additionally awarded Breezevale $1 million for services on an implied contract in law, and $3.495 million for attorneys' fees. The trial court entered judgment on the jury verdict. Exxon appealed.

**EXXON'S APPEAL**

In its first three issues, Exxon attacks the jury's findings that an enforceable contract existed between the parties. Specifically, Exxon claims there is no or insufficient evidence to support the jury's finding that the parties reached an agreement on all the material terms necessary to the formation of an enforceable agreement. Additionally, Exxon contends that, as a matter of law, the claimed oral agreement is unenforceable under the statute of frauds. Finally, Exxon argues the trial court erred in its submission of the jury question on promissory estoppel. Because we agree with Exxon that the statute of frauds applies, we assume without deciding the parties reached an oral agreement, and address Exxon's second issue regarding the applicability of the statute of frauds.

**Statute of Frauds**

The statute of frauds, in section 26.01 of the Texas Business and Commerce Code, provides in pertinent part:

(a) A promise or agreement described in subsection (b) of this section is not enforceable unless the promise or agreement, or a memorandum of it, is

(1) in writing; and

(2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.

Page 436

...

(b) Subsection (a) of this section applies to:

(4) a contract for the sale of real estate;

...

(6) an agreement which is not to be performed within one year from the date of making of the agreement.

TEX. BUS. & COM.CODE ANN. § 26.01 (Vernon 1987). Whether a contract falls within the statute of frauds is a question of law to be decided by the court. *Gerstacker v. Blum Consulting Eng'rs, Inc.,* 884 S.W.2d 845, 849 (Tex.App.-Dallas 1994, writ denied).

In its second issue, Exxon contends the claimed agreement is not enforceable under the statute of frauds because it was not in writing, and (1) the agreement involved the transfer of working interests in oil and gas properties, which are interests in real estate, and (2) the

agreement could not possibly have been performed within one year. Breezevale responds that the agreement does not involve real estate and could possibly have been performed within one year. Breezevale alternatively contends that, if this Court determines the statute of frauds applies, Breezevale avoids the application of the statute of frauds on the ground of either promissory estoppel or partial performance.

 **Interest in Real Estate**

It is undisputed that no written and signed working interest agreement existed between the parties. We, therefore, first turn to the issue of whether the alleged agreement conveyed an interest in real estate. Under Texas law, a conveyance of a working interest in oil and gas is a real property interest that subjects the agreement conveying the interest to the statute of frauds. *Hill v. Heritage Res., Inc.,* 964 S.W.2d 89, 134 (Tex.App.-El Paso 1997, pet. denied); *EP Operating Co. v. MJC Energy Co.,* 883 S.W.2d 263, 267 (Tex.App.-Corpus Christi 1994, writ denied); see also *Procom Energy, L.L.A. v. Roach,* 16 S.W.3d 377, 381 (Tex.App.-Tyler 2000, pet. denied) (working interest and overriding royalty interest in oil and gas lease come within ambit of statute of frauds).

Conceding that the transfer of severable mineral interests in oil and gas leases are regarded as a sale of real estate under the Texas statute of frauds, Breezevale contends on appeal that its agreement with Exxon conveyed an interest in Nigerian Production Sharing Contracts (PSC), not a working interest in mineral production. According to Breezevale, a PSC differs from a Texas oil and gas lease in that the foreign state retains title to the minerals in the ground, giving the holder of the PSC only a contractual right to a share of the production. Consequently, an interest in a PSC is not an interest in real estate and is not subject to the statute of frauds.

Even if the conveyed interest were an interest in a PSC, the relevant issue in determining whether the contract involves real estate is not whether title to the minerals passes, but whether the interest is derived from rights to oil and gas in the ground, making the interest a realty interest subject to the statute of frauds. As the Texas Supreme Court has stated, "a right to land essentially implies a right to profits accruing from it, since, without the latter, the former can be of no value ... [t]hus a devise of the profits of land, or even a grant of them, will pass a right to land itself." *Sheffield v. Hogg,* 124 Tex. 290, 77 S.W.2d 1021, 1028 (1934) (quoting *Green v. Biddle,* 21 U.S. 1, 76, 5 L.Ed. 547 (8 Wheat. 1823)); see also *United States Pipeline Corp. v. Kinder,* 609 S.W.2d 837, 839 (Tex.Civ.App.-Fort Worth 1980, writ ref'd n.r.e.)

Page 437

. Thus, a conveyance of an interest in the minerals that are produced from land, such as a working interest or a royalty interest, passes a right to the land itself. *Pecos Dev. Corp. v. Hydrocarbon Horizons, Inc.,* 803 S.W.2d 266, 267 (Tex.1991) (overriding royalty interest in future production from unleased land is subject to statute of frauds; specifically disapproving court of appeals's holding to contrary).

Here, Breezevale argues Exxon offered it a 2 1/2 percent working interest in its Nigerian production. One of Breezevale's experts, Patrick Rooney, testified the parties' use of the term "working interest" connoted agreement in part to share in the risks, losses, production, and profit of Exxon's mineral development. The PSC gave Exxon unrestricted right of ingress to and egress from "the Contract area," and the right to lift and export oil from the allocated block. We conclude

the interest in this case is derived from rights to oil in the ground and is a property interest subject to the statute of frauds.

Breezevale nonetheless contends the characterization a working interest carries under Texas law is irrelevant because the Texas statute of frauds does not apply to an agreement involving property located in a foreign country. According to Breezevale, the nature of a transferred interest is determined by the law of the place where the property is located; thus, the law of Nigeria should apply to the characterization of the agreement. Even if Breezevale is correct in claiming that Nigerian law should apply to determine the nature of the interest conveyed, Breezevale failed to give notice and prove Nigerian law in the trial court.

A party who intends to raise an issue about foreign law shall give notice and, at least thirty days before trial, furnish all parties copies of any written materials or sources the party intends to use as proof of foreign law. TEX.R. EVID. 203; *Long Distance Int'l, Inc. v. Telefonos de Mexico, S.A. de C.V.,* 49 S.W.3d 347, 350 (Tex.2001). If a party fails to give notice and prove foreign law as provided by the rule, the foreign law may not be applied. *In re Garcia-Chapa,* 33 S.W.3d 859, 863 (Tex.App.-Corpus Christi 2000, no pet.); see also *Pellow v. Cade,* 990 S.W.2d 307, 313 (Tex.App.-Texarkana 1999, no pet.) (absent proper invocation of foreign law by pleading and proof, Texas courts must presume foreign law to be same as that of Texas).

Because Breezevale did not give notice and prove up Nigerian law in the trial court, it cannot rely on *Hunt v. Coastal States Gas Producing Co.,* 583 S.W.2d 322, 325-26 (Tex.1979), to support its assertion that the language of the PSC should control the nature of the interest. In Hunt, the parties properly proved up Libyan law in a pretrial hearing that included testimony of international and foreign law experts. Id. at 327 (Steakley, J., dissenting). Conversely, in this case, Breezevale told the court there was "no need to invoke Nigerian law" and, consistent with that statement, did not submit any evidence of Nigerian law. Breezevale cannot now rely on Nigerian law to claim the conveyed interest was not an interest in real estate. See Garcia-Chapa, 33 S.W.3d at 863; Pellow, 990 S.W.2d at 313.

Because the interest is an interest in real estate, we conclude the oral agreement is subject to the statute of frauds.

## Exceptions to the Statute of Frauds

At trial, Breezevale sought to avoid the statute of frauds based upon two exceptions to the statute: promissory estoppel and partial performance. The jury answered "yes" to questions on both of these exceptions. Exxon contends the evidence

Page 438

is legally and factually insufficient to support the jury's answers to both questions.

## Standard of Review

When considering the legal sufficiency of the evidence, we consider only the evidence and inferences tending to support the jury's finding, disregarding all evidence to the contrary. *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992). If the record contains any evidence of probative force to support the jury's finding, the finding will be upheld. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997). When considering the factual sufficiency of the evidence, we assess all the evidence and reverse for a new trial only if the challenged finding is so against the great

weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). When both legal and factual sufficiency points are raised, we first review legal sufficiency to determine if there is any evidence of probative value to support the jury's findings. *Glover v. Tex. Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

## Promissory Estoppel

In its third issue, Exxon complains the trial court erred in its submission of the jury question on promissory estoppel because it was an incorrect statement of the law. Exxon also attacks the sufficiency of the evidence to support the jury's answer. Jury question No. 3 asked, "Did Breezevale reasonably rely upon the oral promise of Exxon, if any, to reduce its oral agreement to writing?"

Promissory estoppel applies to bar the application of the statute of frauds and allow the enforcement of an otherwise unenforceable oral agreement when (1) the promisor makes a promise that he should have expected would lead the promisee to some definite and substantial injury; (2) such an injury occurred; and (3) the court must enforce the promise to avoid the injury. Nagle v. Nagle, 633 S.W.2d 796, 800 (Tex.1982); " Moore" Burger, Inc. v. Phillips Petroleum Co., 492 S.W.2d 934, 936 (Tex.1972). To invoke the application of promissory estoppel where there is an oral promise to sign an agreement, as in this case, the agreement that is the subject of the promise must comply with the statute of frauds. " Moore" Burger, 492 S.W.2d at 940 (op. on reh'g). That is, the agreement must be in writing at the time of the oral promise to sign it. *Sonnichsen v. Baylor Univ.,* 47 S.W.3d 122, 126 (Tex.App.-Waco 2001, no pet.); *Mann v. NCNB Tex. Nat'l Bank,* 854 S.W.2d 664, 668 (Tex.App.-Dallas 1992, no writ); *Beta Drilling, Inc. v. Durkee,* 821 S.W.2d 739, 741 (Tex.App.-Houston [14th Dist.] 1992, writ denied).

Breezevale first contends the law is unclear as to whether the doctrine of promissory estoppel may be applied in the absence of a written contract in existence at the time of the promise. However, we agree with the court in Sonnichsen that "the holding from "Moore" Burger is clear" that the agreement must be in writing at the time the promise is made. Sonnichsen, 47 S.W.3d at 126; see also Mann, 854 S.W.2d at 668 (where this Court held an agreement in writing at time of promise is required element of promissory estoppel). According to Breezevale, because Mudd told Habib at the April 3rd meeting that Exxon was going to memorialize the working interest agreement into an attachment to the draft service agreement, "there was every reason for Mr. Habib to believe this either had been done or could be done and [would be] ready to sign during their next meeting." Irrespective of what Habib believed, there is no evidence

Page 439

either that (1) the attachment was ever prepared or (2) Mudd or any other Exxon representative told Habib the working interest agreement had already been prepared. Thus, there is no probative evidence in the record that the working interest agreement was in writing on April 3, 1992.

Pointing out that the promissory estoppel question submitted to the jury did not include the requirement that a writing exist when the promise was made, Breezevale argues Exxon waived any charge error by not submitting a substantially correct jury question. However, if there is no evidence to support one or more of the elements of the doctrine, it is irrelevant whether Exxon

submitted a proper question. See TEX.R. CIV. P. 279 ("A claim that the evidence was legally or factually insufficient to warrant the submission of any question may be made for the first time after the verdict, regardless of whether the submission of such question was requested by the complainant.") Rather, the issue is whether the evidence supports the finding, including any deemed findings on elements not included in the question. See *Crosbyton Seed Co. v. Mechura Farms,* 875 S.W.2d 353, 363-64 (Tex.App.-Corpus Christi 1994, no writ); see also *Auto. Ins. Co. v. Davila,* 805 S.W.2d 897, 902 (Tex.App.-Corpus Christi 1991, writ denied) (element may not be deemed found by court if no evidence supports it).

We conclude that, because there is no evidence there was a written working interest agreement in existence on April 3, 1992, there is no evidence to support the jury finding of promissory estoppel. We therefore overturn the jury's finding on Question No. 3. [3]

**Partial Performance**

Breezevale also relies on the jury's affirmative answer to the question, "Did Breezevale partially perform the agreement, if any?" in arguing the doctrine of partial performance bars application of the statute of frauds in this case. Exxon contends there is no or insufficient evidence to support a finding of partial performance.

Under the partial performance exception to the statute of frauds, contracts that have been partly performed, but do not meet the requirements of the statute of frauds, may be enforced in equity if denial of enforcement would amount to a virtual fraud. *Carmack v. Beltway Dev. Co.,* 701 S.W.2d 37, 40 (Tex.App.-Dallas 1985, no writ). The fraud arises when there is strong evidence establishing the existence of an agreement and its terms, the party acting in reliance on the contract has suffered a substantial detriment for which he has no adequate remedy, and the other party, if permitted to plead the statute, would reap an unearned benefit. Id.; see also *Hooks v. Bridgewater,* 111 Tex. 122, 229 S.W. 1114, 1116 (1921). The partial performance must be "unequivocally referable to the agreement and corroborative of the fact that a contract actually was made." *Wiley v. Bertelsen,* 770 S.W.2d 878, 882 (Tex.App.-Texarkana 1989, no writ) (citing *Chevalier v. Lane's, Inc.,* 147 Tex. 106, 213 S.W.2d 530, 533-34 (1948)). The acts of performance relied upon to take a parol contract out of the statute of frauds must be such as could have been done with no other design than

Page 440

to fulfill the particular agreement sought to be enforced; otherwise, they do not tend to prove the existence of the parol agreement relied upon by the plaintiff. *Teague v. Roper,* 526 S.W.2d 291, 293 (Tex.Civ.App.-Amarillo, 1975 writ ref'd n.r.e.) (citing *Francis v. Thomas,* 129 Tex. 579, 106 S.W.2d 257, 260 (1937)).

Exxon contends Breezevale's claim of partial performance is not "unequivocally referable" to the working interest contract because Breezevale's actions could be referable to the services contract. Breezevale does not dispute that it never paid Exxon any of the costs associated with a working interest in Exxon's blocks. The action on which Breezevale relies as evidence of its partial performance is Habib's trip to Nigeria on April 4, 1992. [4] Breezevale contends Habib's trip to Nigeria during this time period constituted sufficient partial performance to take the contract out of the statute of frauds because Habib went to Nigeria in reliance on Exxon's promise of a working

interest in any block awarded. Exxon argues that such performance does not "show strong evidence establishing the existence of the [working interest] agreement and its terms," see Carmack, 701 S.W.2d at 40, and is more referable to the services agreement the parties were negotiating than the working interest agreement.

Applying the no-evidence standard of review, and viewing the evidence in the light most favorable to Breezevale, we find there is no evidence that Habib's actions in going to Nigeria were unequivocally referable to the working interest contract, because even Breezevale admits there was a services contract being negotiated between the parties and that it had been providing Exxon with liaison services similar to those provided during the trip throughout the eighteen-month period. See Teague, 526 S.W.2d at 293 (performance must be such as could have been done with no other design than to fulfill particular agreement sought to be enforced); see also *Rodriguez v. Klein,* 960 S.W.2d 179, 186 (Tex.App.-Corpus Christi 1997, no pet.) (because party's performance was required under one or more of three agreements, including bill of sale, it could not be unequivocally referable to bill of sale); Beta Drilling, 821 S.W.2d at 741 (overturning jury finding on partial performance because appellee's employment services were not unequivocally referable to oral agreement for sale of securities). In a no-evidence review of whether the performance was "unequivocally referable," the relevant issue is not whether there is evidence that the performance could be referable to the contract which the party is trying to enforce; rather, it is whether there is evidence that the performance is solely referable to the contract. See Teague, 526 S.W.2d at 293; Rodriguez, 960 S.W.2d at 186.

Habib's actions in traveling to Nigeria and speaking with the government officials on Exxon's behalf were consistent with the services Breezevale had performed in the previous eighteen months and could be referable to the services agreement. Further, nothing in Habib's trip to Nigeria, even if made at the request of Exxon, showed "strong evidence establishing the existence of the [working interest] agreement and its terms." See Carmack, 701 S.W.2d at 40. We conclude there is no evidence that Breezevale's performance was unequivocally referable to the working interest agreement.

Page 441

Moreover, even assuming there was evidence that Breezevale's actions were unequivocally referable to the working interest agreement, the doctrine of partial performance also requires that the party acting in reliance on the agreement suffer a substantial detriment for which there is no adequate remedy. See Hooks, 229 S.W. at 1116; Carmack, 701 S.W.2d at 40. If Breezevale were successful in removing the oral agreement from the statute of frauds because of partial performance, Breezevale would be entitled to only reliance damages. See *Magcobar N. Am. v. Grasso Oilfield Servs., Inc.,* 736 S.W.2d 787 (Tex.App.-Corpus Christi 1987) (court's holding that party may recover reliance damages and not breach of contract damages in case where promissory estoppel takes case out of statute of frauds is consistent with equity, the principle underlying all exceptions to statute of frauds), writ dism'd by agr., 754 S.W.2d 646 (Tex.1988); see also *Adams v. Petrade Int'l, Inc.,* 754 S.W.2d 696, 708 (Tex.App.-Houston [1st Dist.] 1988, writ denied) (relying on "settled law" that party's damages based on promissory estoppel as exception to statute of frauds are not measured by profits that reliance led him to expect, but limited to

amount necessary to compensate party for loss already suffered). Breezevale's reliance damages would encompass only the services Habib performed during his April trip to Nigeria. See *Fretz Constr. Co. v. Southern Nat'l Bank,* 626 S.W.2d 478, 483 (Tex.1981) (reliance damages are amount necessary to restore plaintiff to position he would have been in had he not acted in reliance on promise). We conclude that because Breezevale received $1 million on its contract implied in law claim, it had an adequate remedy as a matter of law. Cf. Carmack, 701 S.W.2d at 40 (in analyzing partial performance of Beltway, court noted Beltway had no other adequate remedy because broker could not recover for same services on implied contract, quasi contract, or quantum meruit theory); Wiley, 770 S.W.2d 878, 882 (if person receives payment for services, those services will not constitute partial performance as exception to statute of frauds).

Because there is no evidence that Breezevale's partial performance was unequivocally referable to the working interest agreement, and because Breezevale did not suffer a substantial detriment for which it had no adequate remedy, there is no evidence to support the jury's finding on partial performance. We overturn the jury's finding to Jury Question No. 4.

**Attorneys' Fees**

Exxon contends if the award for breach of contract is reversed, this Court must likewise reverse the trial court's award of $3.495 million in attorneys' fees. Breezevale responds that even if this Court reverses the breach of contract claim, it is still entitled to attorneys' fees on its $1 million award for the contract implied in law, or quantum meruit, claim. We agree with Breezevale.

Exxon does not appeal the jury's finding that Breezevale performed compensable services in the amount of $1 million, nor does it argue attorneys' fees are not recoverable for the cause of action underlying the $1 million award. Rather, Exxon asserts Breezevale cannot recover attorneys' fees based on the award because Breezevale claimed, in a pretrial hearing, that it was not seeking compensation for services rendered. According to Exxon, because Breezevale could not have expended attorney time and expenses on a claim it disavowed, there would be no evidence to support an award of attorneys' fees on that basis. Exxon further claims there could have been no presentment of a claim that Breezevale denied it was seeking.

Page 442

The fact that Breezevale stated in a pretrial hearing it was not seeking compensation for services rendered is irrelevant in light of the fact that the trial court submitted a jury question on the issue, which Exxon does not appeal. Because Exxon did not complain of the trial court's submission of the question and the jury's affirmative answer to it, it cannot now complain the issue was not raised and litigated at trial. Further, because the issues involved in the quantum meruit claim are necessarily interrelated with Breezevale's breach of contract claim, we also decline to find there was no presentment of the attorneys' fees claim. The record shows that, after receiving the letter from Exxon terminating the relationship, Breezevale communicated with Exxon regarding its belief that it had a valid contract with Exxon, that Exxon should fulfill the contract, and that it had performed valuable services for Exxon. We conclude this is sufficient evidence of presentment. See *Jones v. Kelley,* 614 S.W.2d 95, 100 (Tex.1981) (no particular form of presentment required); see also *Criton Corp. v. Highlands Ins. Co.,* 809 S.W.2d 355, 358 (Tex.App.-Houston [14th Dist.] 1991, writ denied) (holding oral request to tender full performance

under contract, which was refused, sufficient to establish presentment).

Exxon does not dispute that attorneys' fees may be awarded for claims arising out of quantum meruit, or that the quantum meruit claim is not so interrelated with the contract claim as to be more or less inseparable. See *Weitzul Constr., Inc. v. Outdoor Environs,* 849 S.W.2d 359, 366 (Tex.App.-Dallas 1993, writ denied). Therefore, because attorneys' fees are authorized on the quantum meruit cause of action, Breezevale may recover the total amount of attorneys' fees the trial court awarded. See id.

## Conclusion

Because we conclude the statute of frauds applies to render the oral agreement unenforceable, we need not reach Exxon's other issues. We reverse the jury's finding to Question No. 1 and its award of $34.3 million. We render judgment that Breezevale take nothing on its claim for breach of an oral contract. We affirm the $3.495 million award of attorneys' fees.

## BREEZEVALE'S CROSS APPEAL

Breezevale brings three issues in a cross appeal. Because of our disposition of Exxon's appeal, we address only one of Breezevale's issues.

In its second issue, Breezevale contends the trial court erred in granting a directed verdict on Breezevale's breach of fiduciary duty claim based on a two-year statute of limitations. In a "reply point and conditional cross point," [5] Exxon contends that even if the trial court erred in granting the directed verdict based on the statute of limitations, the breach of fiduciary duty claim was still properly dismissed because there was no evidence of a fiduciary relationship. We agree with Exxon's conditional cross point.

A court may direct a verdict if no evidence of probative force raises a fact issue on the material issue. *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994). On review, we examine the evidence in the light most favorable to the party against whom the verdict was rendered,

Page 443

disregarding all contrary evidence and inferences. Id.; *Rodriguez v. United Van Lines, Inc.,* 21 S.W.3d 382, 383 (Tex.App.-San Antonio 2000, pet. denied). When no evidence of probative force on an ultimate fact element exists, or when the probative force of the evidence is so weak that only mere surmise or suspicion is raised as to the existence of essential facts, the trial court has the duty to instruct the verdict. *Villarreal v. Art Inst. of Houston, Inc.* 20 S.W.3d 792, 796 (Tex.App.-Corpus Christi 2000, no pet.). The reviewing court may affirm a directed verdict even if the trial court's rationale for granting the directed verdict is erroneous, provided the directed verdict can be supported on another basis. Id.

There are two types of fiduciary relationships-formal and informal. Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp., 823 S.W.2d 591, 593-94 (Tex.1992). Formal fiduciary relationships arise as a matter of law, and include the relationships between attorney and client, principal and agent, partners, and joint venturers. *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 674 (Tex.1998). Informal fiduciary relationships arise from "a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship." *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 287 (Tex.1998). Confidential relationships may arise

when one party has dealt with another in a certain manner for a long period of time such that one party is justified in expecting the other to act in its best interest, Morris, 981 S.W.2d at 674, and in cases where "influence has been acquired and abused, in which confidence has been reposed and betrayed." Associated Indem. Corp., 964 S.W.2d at 287. However, to give full force to contracts, we do not recognize such a relationship lightly. *Burleson State Bank v. Plunkett,* 27 S.W.3d 605, 611 (Tex.App.-Waco 2000, pet. denied) (citing *Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962)). To impose such a relationship in a business transaction, the relationship must exist prior to, and apart from, the agreement made the basis of the suit. *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 177 (Tex.1997). The fact that one businessman trusts another and relies on another to perform a contract does not give rise to a confidential relationship, because something apart from the transaction between the parties is required. Crim, 823 S.W.2d at 594. Although the existence of a confidential relationship is ordinarily a question of fact, where there is no evidence to establish the relationship, it is a question of law. Seymour v. Am. Engine & Grinding Co., 956 S.W.2d 49, 60 (Tex.App.-Houston [14th Dis.] 1996, writ denied); *Kline v. O'Quinn,* 874 S.W.2d 776, 786 (Tex.App.-Houston [14th Dist.] 1994, writ denied).

Breezevale first asserts that a formal fiduciary relationship existed because it was partners with Exxon. However, we have held there was no working interest agreement between the parties because any oral agreement violated the statute of frauds. Therefore, there is no evidence the parties were working interest partners. See Schlumberger, 959 S.W.2d at 176 (partnership consists of express or implied agreement containing four required elements: (1) community of interest in venture, (2) agreement to share profits, (3) agreement to share losses, and mutual right of control or management of enterprise). Without an agreement, there is no evidence the parties were partners and no evidence to support Breezevale's argument that a formal fiduciary relationship existed arising from the partnership.

Breezevale also argues it submitted evidence that Breezevale and Exxon
Page 444.
had developed a relationship of trust and confidence and there was some evidence of an informal fiduciary relationship between the parties. It relies on evidence that before Exxon and Breezevale began the dealings at issue in this suit, Breezevale had a ten-year distributorship relationship with Exxon Chemical in Nigeria. However, the evidence shows Exxon Chemical is a separate Exxon affiliate, and nothing in the record indicates this relationship was anything more than an arms-length business relationship. See *Gillum v. Republic Health Corp.,* 778 S.W.2d 558, 568 (Tex.App.-Dallas 1989, no writ) (plaintiff could not bootstrap prior relationship with two separate entities to claim twenty-six year confidential relationship with defendant hospital).

Breezevale also relies on evidence it "trusted Exxon's numerous promises that an agreement ... would be forthcoming;" it clearly informed Exxon it wanted a long-term relationship; it shared with Exxon confidential information it learned from the Nigerian officials regarding the bidding process; and Exxon requested that Breezevale work exclusively for Exxon. Even if true, these facts are not evidence of an informal fiduciary relationship. Breezevale's claim that it subjectively trusted Exxon to provide it a working interest agreement is insufficient to impose fiduciary obligations on Exxon as a matter of law. Mere subjective trust does not transform arms-

length dealing into a fiduciary relationship. Schlumberger, 959 S.W.2d at 177; Crim, 823 S.W.2d at 595; see also *Tyra v. Woodson,* 495 S.W.2d 211, 213 (Tex.1973) ("[T]he fact that one businessman trusts another, and relies upon his promise to carry out a contract, does not create a constructive trust ... [t]o hold otherwise would render the Statute of Frauds meaningless.") The record shows the parties had an arms-length relationship, with each party separately represented by its own counsel. There is no evidence of a long-term relationship apart from the parties' negotiations for the services contract and working interest agreement. See Crim, 823 S.W.2d at 594. We conclude that, because the record contains no evidence of a fiduciary relationship between the parties, the trial court did not erred in granting Exxon's motion for directed verdict on Breezevale's breach of fiduciary duty claim. Furthermore, the trial court erred in denying Exxon's motion for directed verdict on Breezevale's claim that it had a "special relationship of trust and confidence" with Exxon. Consequently, we find no merit in Breezevale's second issue in its cross appeal.

We reverse the trial court's award of $34.3 million against Exxon for breach of contract and affirm the remaining portions of the trial court's judgment that are the subject of this appeal.

---------

Notes:

[1] The Honorable David F. Farris, Retired Justice, Second District Court of Appeals, Fort Worth, Texas, sitting by assignment.

[2] Exxon does not appeal the portion of the trial court's judgment awarding Breezevale $1 million for breach of contract implied in law, acknowledging that Breezevale provided services for which it should be compensated. Therefore, we express no opinion as to the validity of that portion of the judgment, and the $1 million award stands.

[3] In its appellate brief, Breezevale also argues Exxon should be equitably estopped from relying on the statute of frauds because of its claims that Exxon misled Breezevale. The doctrine of equitable estoppel, being distinct from the doctrine of promissory estoppel, was never submitted to the jury. Breezevale thus waived any equitable estoppel claim. See TEX.R. CIV. P. 279; Brown v. Bank of Galveston, N.A., 963 S.W.2d 511, 515 (Tex.1998).

[4] Any performance by Breezevale in reliance on the contract necessarily had to occur between April 3, 1992, the date of the agreement, and mid-April, when Exxon terminated the relationship by letter, because only during this time could Breezevale have reasonably relied on the existence of an agreement.

[5] Because the trial court denied Exxon's motion for directed verdict on Breezevale's claim that it had enjoyed a "special relationship of trust and confidence" with Exxon, Exxon conditionally appeals this ruling in the event we reach the issue of whether there was a special relationship.

---------